[No. S157601. Mar. 30, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
SARUN CHUN, Defendant and Appellant.

## COUNSEL

Mark D. Greenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Dallas Sacher, for Sixth District Appellate Program, as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Mary Jo Graves and Michael P. Farrell, Assistant Attorneys General, John G. McLean, Janet Neeley, Stephen G. Herndon, Melissa Lipon and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—In this murder case, the trial court instructed the jury on second degree felony murder with shooting at an occupied vehicle under Penal Code section 246, the underlying felony.[1] We granted review to consider various issues concerning the validity and scope of the second degree felony-murder rule.

We first discuss the rule's constitutional basis. Although the rule has long been part of our law, some members of this court have questioned its constitutional validity. We conclude that the rule is based on statute, specifically section 188's definition of implied malice, and hence is constitutionally valid.

Next we reconsider the contours of the so-called merger doctrine this court adopted in *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580] (*Ireland*). After reviewing recent developments, primarily some of our own decisions, we conclude the current state of the law in this regard is untenable. We will overrule some of our decisions and hold that all assaultive-type crimes, such as a violation of section 246, merge with the charged homicide and cannot be the basis for a second degree felony-murder instruction. Accordingly, the trial court erred in instructing on felony murder in this case. We also conclude, however, that this error, alone, was not prejudicial.

We reverse the judgment of the Court of Appeal, which had found the same error prejudicial. However, the Court of Appeal also found a second error, a finding not before us on review. We remand the matter to the Court of Appeal to decide whether the two errors, in combination, were prejudicial.

### I. FACTS AND PROCEDURAL HISTORY

We take our facts primarily from the Court of Appeal's opinion.

Judy Onesavanh and Sophal Ouch were planning a party for their son's birthday. Around 9:00 p.m. on September 13, 2003, they and a friend, Bounthavy Onethavong, were driving to the store in Stockton in a blue Mitsubishi that Onesavanh's father owned. Onesavanh's brother, George, also drives the car. The police consider George to be highly ranked in the Asian Boys street gang (Asian Boys).

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

That evening Ouch was driving, with Onesavanh in the front passenger seat and Onethavong behind Ouch. While they were stopped in the left turn lane at a traffic light, a blue Honda with tinted windows pulled up beside them. When the light changed, gunfire erupted from the Honda, hitting all three occupants of the Mitsubishi. Onethavong was killed, having received two bullet wounds in the head. Onesavanh was hit in the back and seriously wounded. Ouch was shot in the cheek and suffered a fractured jaw.

Ouch and Onesavanh identified the Honda's driver as "T-Bird," known to the police to be Rathana Chan, a member of the Tiny Rascals Gangsters (Tiny Rascals), a criminal street gang. The Tiny Rascals do not get along with the Asian Boys. Chan was never found. The forensic evidence showed that three different guns were used in the shooting, a .22, a .38, and a .44, and at least six bullets were fired. Both the .38 and the .44 struck Onethavong; both shots were lethal. Only the .44 was recovered. It was found at the residence of Sokha and Mao Bun, brothers believed to be members of a gang.

Two months after the shooting, the police stopped a van while investigating another suspected gang shooting. Defendant was a passenger in the van. He was arrested and subsequently made two statements regarding the shooting in this case. He admitted he was in the backseat of the Honda at the time; T-Bird was the driver and there were two other passengers. Later, he also admitted he fired a .38-caliber firearm. He said he did not point the gun at anyone; he just wanted to scare them.

Defendant, who was 16 years old at the time of the shooting, was tried as an adult for his role in the shooting. He was charged with murder, with driveby and gang special circumstances, and with two counts of attempted murder, discharging a firearm from a vehicle, and shooting into an occupied vehicle, all with gang and firearm-use allegations, and with street terrorism. At trial, the prosecution presented evidence that defendant was a member of the Tiny Rascals, and that the shooting was for the benefit of a gang. Defendant testified, denying being a member of the Tiny Rascals or being involved in the shooting.

The prosecution sought a first degree murder conviction. The court also instructed the jury on second degree felony murder based on shooting at an occupied motor vehicle (§ 246) either directly or as an aider and abettor. The jury found defendant guilty of second degree murder. It found the personal-firearm-use allegation not true, but found that a principal intentionally used a firearm and the shooting was committed for the benefit of a criminal street

gang. The jury acquitted defendant of both counts of attempted murder, shooting from a motor vehicle, and shooting at an occupied motor vehicle. It convicted defendant of being an active participant in a criminal street gang.

The Court of Appeal, in an opinion authored by Justice Morrison, reversed the murder conviction and otherwise affirmed the judgment. It found two errors in the case. It held the trial court had properly admitted defendant's first statement that he had been in the car but that the court should have excluded his subsequent statement that he had fired a gun. It concluded that the latter statement was procured by a false promise of leniency. It found this error harmless beyond a reasonable doubt "as a pure evidentiary matter." But, partly due to this error, the Court of Appeal also held the trial court erred in instructing the jury on second degree felony murder. It found this error was prejudicial and reversed the murder conviction. It explained: "Second degree felony murder, the only express theory of second degree murder offered to the jury, was based on the underlying felony of shooting into an occupied vehicle. The merger doctrine prevents using an assaultive-type crime as the basis for felony murder unless the underlying crime is committed with an intent collateral to committing an injury that would cause death. Without the evidence of defendant's statements about the shooting, there was no evidence from which a collateral intent or purpose could be found. Accordingly, it was error to instruct on second degree felony murder and the murder conviction must be reversed."

Justice Nicholson dissented from the reversal of the murder conviction. Relying on *People v. Hansen* (1994) 9 Cal.4th 300 [36 Cal.Rptr.2d 609, 885 P.2d 1022] (*Hansen*), he argued that the underlying felony did not merge with the homicide for purposes of the second degree felony-murder rule and, accordingly, the trial court had properly instructed the jury on second degree felony murder.

We granted review. Later, we issued an order limiting review to the issues concerning whether the trial court prejudicially erred in instructing the jury on second degree felony murder.

## II. DISCUSSION

### A. *The Constitutionality of the Second Degree Felony-murder Rule*

Defendant contends California's second degree felony-murder rule is unconstitutional on separation of power grounds as a judicially created doctrine with no statutory basis. To explain the issue, we first describe how the doctrine fits in with the law of murder. Then we discuss defendant's

contention. We will ultimately conclude that the doctrine is valid as an interpretation of broad statutory language.

■ Section 187, subdivision (a), defines murder as "the unlawful killing of a human being, or a fetus, with malice aforethought." Except for the phrase "or a fetus," which was added in 1970 in response to this court's decision in *Keeler v. Superior Court* (1970) 2 Cal.3d 619 [87 Cal.Rptr. 481, 470 P.2d 617] (see *People v. Davis* (1994) 7 Cal.4th 797, 803 [30 Cal.Rptr.2d 50, 872 P.2d 591]), this definition has been unchanged since section 187 was first enacted as part of the Penal Code of 1872. Murder is divided into first and second degree murder. (§ 189.) "Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. (§§ 187, subd. (a), 189; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102 [13 Cal.Rptr.2d 864, 840 P.2d 969].)" (*Hansen, supra,* 9 Cal.4th at p. 307.)

Critical for our purposes is that the crime of murder, as defined in section 187, includes, as an element, malice. Section 188 defines malice. It may be either express or implied. It is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) It is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*) This definition of implied malice is quite vague. Trial courts do not instruct the jury in the statutory language of an abandoned and malignant heart. Doing so would provide the jury with little guidance. "The statutory definition of implied malice has never proved of much assistance in defining the concept in concrete terms." (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1217 [264 Cal.Rptr. 841, 783 P.2d 200].) Accordingly, the statutory definition permits, even requires, judicial interpretation. We have interpreted implied malice as having "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' (*People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' (*Ibid.,* internal quotation marks omitted.)" (*People v. Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549] (lead opn. of Kennard, J.) (*Patterson*).)[2]

[2] For ease of discussion, we will sometimes refer to this form of malice by the shorthand term, "conscious-disregard-for-life malice." *Patterson, supra,* 49 Cal.3d 615, had no majority opinion. Unless otherwise indicated, all further citations to that case are to Justice Kennard's lead opinion.

■ A defendant may also be found guilty of murder under the felony-murder rule. The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state. The rule has two applications: first degree felony murder and second degree felony murder. We have said that first degree felony murder is a "creation of statute" (i.e., § 189) but, because no statute specifically describes it, that second degree felony murder is a "common law doctrine." (*People v. Robertson* (2004) 34 Cal.4th 156, 166 [17 Cal.Rptr.3d 604, 95 P.3d 872] (*Robertson*).) First degree felony murder is a killing during the course of a felony specified in section 189, such as rape, burglary, or robbery. Second degree felony murder is "an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189 . . . ." (*Robertson, supra*, 34 Cal.4th at p. 164.)

In *Patterson*, Justice Kennard explained the reasoning behind and the justification for the second degree felony-murder rule: "The second degree felony-murder rule eliminates the need for the prosecution to establish the *mental* component [of conscious-disregard-for-life malice]. The justification therefor is that, when society has declared certain inherently dangerous conduct to be felonious, a defendant should not be allowed to excuse himself by saying he was unaware of the danger to life because, by declaring the conduct to be felonious, society has warned him of the risk involved. The *physical* requirement, however, remains the same; by committing a felony inherently dangerous to life, the defendant has committed 'an act, the natural consequences of which are dangerous to life' ([*People v.*] *Watson, supra*, 30 Cal.3d at p. 300), thus satisfying the physical component of implied malice." (*Patterson, supra*, 49 Cal.3d at p. 626.)

The second degree felony-murder rule is venerable. It "has been a part of California's criminal law for many decades. (See *People* v. *Wright* (1914) 167 Cal. 1, 5 [138 P. 349]; Pike, *What Is Second Degree Murder in California* (1936) 9 So.Cal. L.Rev. 112, 118–119.)" (*Patterson, supra*, 49 Cal.3d at p. 621; see also *People v. Doyell* (1874) 48 Cal. 85, 94.) Because of this, we declined to reconsider the rule in *Patterson*. (*Patterson, supra*, at p. 621.) Even earlier, in 1966, we rejected the argument that we should abandon the doctrine, explaining that "the concept lies imbedded in our law." (*People v. Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]; see also *People v. Mattison* (1971) 4 Cal.3d 177, 184 [93 Cal.Rptr. 185, 481 P.2d 193] (*Mattison*) [describing the rule as "well-settled"].)

But some former and current members of this court have questioned the rule's validity because no statute specifically addresses it. Chief Justice Bird argued for its abolition in her concurring opinion in *People v. Burroughs*

(1984) 35 Cal.3d 824, 836–854 [201 Cal.Rptr. 319, 678 P.2d 894]. Justice Brown did so in dissent in *Robertson, supra*, 34 Cal.4th at pages 186–192, and again while concurring and dissenting in *People v. Howard* (2005) 34 Cal.4th 1129, 1140–1141 [23 Cal.Rptr.3d 306, 104 P.3d 107]. Justices Werdegar and Moreno have viewed the rule as ripe for reconsideration in an appropriate case. (*Robertson, supra*, at pp. 174–177 (conc. opn. of Moreno, J.), 185–186 (dis. opn. of Werdegar, J.).) In *Patterson*, Justice Panelli questioned the rule's constitutional validity. As he pointed out, "There are, or at least should be, no nonstatutory crimes in this state. (*In re Brown* (1973) 9 Cal.3d 612, 624 [108 Cal.Rptr. 465, 510 P.2d 1017]; see Pen. Code, § 6.)" (*Patterson, supra*, 49 Cal.3d at p. 641 (conc. & dis. opn. of Panelli, J.).) He was concerned that the second degree felony-murder rule is solely a judicial creation not derived from statute and was thus "not quite convinced" that it "stands on solid constitutional ground." (*Ibid.*)

In line with these concerns, defendant argues that the second degree felony-murder rule is invalid on separation of powers grounds. As he points out, we have repeatedly said that " 'the power to define crimes and fix penalties is vested exclusively in the legislative branch.' (*Keeler v. Superior Court*[, *supra*,] 2 Cal.3d 619, 631 . . . ; [citations].)" (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 516 [53 Cal.Rptr.2d 789, 917 P.2d 628].) Defendant asks rhetorically, "How, then, in light of the statutory abrogation of common law crimes and the constitutional principle of separation of powers, does second degree felony murder continue to exist when this court has repeatedly acknowledged that the crime is a judicial creation?"

■   This court has never directly addressed these concerns and this argument, or explained the statutory basis of the second degree felony-murder rule. We do so now. We agree with Justice Panelli that there are no nonstatutory crimes in this state. Some statutory or regulatory provision must describe conduct as criminal in order for the courts to treat that conduct as criminal. (§ 6.)[3] But, as we explain, the second degree felony-murder rule, although derived from the common law, is based on statute; it is simply another interpretation of section 188's "abandoned and malignant heart" language.

■   Many provisions of the Penal Code were enacted using common law terms that must be interpreted in light of the common law. For example, section 484 defines theft as "feloniously" taking the property of another. The

---

[3] As relevant today, section 6 provides: "No act or omission . . . is criminal or punishable, except as prescribed or authorized by this Code, or by some of the statutes which it specifies as continuing in force and as not affected by its provisions, or by some ordinance, municipal, county, or township regulation, passed or adopted, under such statutes and in force when this Code takes effect."

term "feloniously"—which has little meaning by itself—incorporates the common law requirement that the perpetrator must intend to permanently deprive the owner of possession of the property. Accordingly, we have looked to the common law to determine the exact contours of that requirement. (*People v. Avery* (2002) 27 Cal.4th 49, 55 [115 Cal.Rptr.2d 403, 38 P.3d 1]; *People v. Davis* (1998) 19 Cal.4th 301, 304, fn. 1 [79 Cal.Rptr.2d 295, 965 P.2d 1165].) Thus, the intent-to-permanently-deprive requirement, although nonstatutory in the limited sense that no California statute uses those words, is based on statute. The murder statutes are similarly derived from the common law. (*Keeler v. Superior Court, supra*, 2 Cal.3d 619 [looking to the common law to determine the exact meaning of "human being" under § 187].) "It will be presumed . . . that in enacting a statute the Legislature was familiar with the relevant rules of the common law, and, when it couches its enactment in common law language, that its intent was to continue those rules in statutory form." (*Keeler v. Superior Court, supra*, at p. 625.)

Even conscious-disregard-for-life malice is nonstatutory in the limited sense that no California statute specifically uses those words. But that form of implied malice is firmly based on statute; it is an interpretation of section 188's "abandoned and malignant heart" language. Similarly, the second degree felony-murder rule is nonstatutory in the sense that no statute specifically spells it out, but it is also statutory as another interpretation of the same "abandoned and malignant heart" language. We have said that the "felony-murder rule eliminates the need for proof of malice in connection with a charge of murder, thereby rendering irrelevant the presence or absence of actual malice, both with regard to first degree felony murder and second degree felony murder." (*Robertson, supra*, 34 Cal.4th at p. 165.) But analytically, this is not precisely correct. The felony-murder rule renders irrelevant *conscious-disregard-for-life* malice, but it does not render malice itself irrelevant. Instead, the felony-murder rule "acts as a substitute" for conscious-disregard-for-life malice. (*Patterson, supra*, 49 Cal.3d at p. 626.) It simply describes a different form of malice under section 188. "The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life." (*Hansen, supra*, 9 Cal.4th at p. 308.)

A historical review confirms this view. California's first penal law was the Crimes and Punishments Act of 1850 (Act of 1850). (Stats. 1850, ch. 99, p. 229.) Section 19 of that act defined murder as "the unlawful killing of a human being, with malice aforethought, either express or implied. The unlawful killing may be effected by any of the various means by which death may be occasioned." (Stats. 1850, ch. 99, § 19, p. 231.) Sections 20 and 21 of the Act of 1850 defined express and implied malice, respectively. Section 21 stated, "Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and

malignant heart." (Stats. 1850, ch. 99, § 21, p. 231.) It also set the punishment for murder as death. At that time, murder was not divided into degrees. The division of murder into degrees "occurred in 1856, when the Legislature amended section 21 of the Act of 1850 to divide the crime of murder into two degrees: first degree murder was defined as that committed by certain listed means or in the perpetration of certain listed felonies, while all other murders were of the second degree." (*People v. Dillon* (1983) 34 Cal.3d 441, 466 [194 Cal.Rptr. 390, 668 P.2d 697] (*Dillon*).)

Sections 22 to 25 of the Act of 1850 concerned voluntary and involuntary manslaughter. Section 25 provided, in its entirety, "Involuntary manslaughter shall consist in the killing of a human being, without any intent so to do; *in the commission of an unlawful act*, or a lawful act, which probably might produce such a consequence in an unlawful manner; *Provided*, that *where such involuntary killing* shall happen in the commission of an unlawful act, which in its consequences naturally tends to destroy the life of a human being, or *is committed in the prosecution of a felonious intent, the offence shall be deemed and adjudged to be murder.*" (Stats. 1850, ch. 99, § 25, p. 231, italics of "Provided" in original, all other italics added.)

In 1872, the Legislature adopted the current Penal Code. Section 187 defined murder essentially the same as did the Act of 1850. (*Keeler v. Superior Court, supra*, 2 Cal.3d at p. 624.) As can readily be seen, section 188 also defined implied malice essentially the same as did the Act of 1850.

But the 1872 Penal Code did recast the definition of involuntary manslaughter. The new section 192 defined voluntary and involuntary manslaughter, as it still does today. (In the interim, vehicular manslaughter has been added as another form of manslaughter.) Subdivision 2 of that section defined and, now labeled subdivision (b), still defines, involuntary manslaughter as an unlawful killing without malice "in the commission of an unlawful act, *not amounting to felony*; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b), italics added.) The proviso portion of section 25 of the Act of 1850 was deleted and essentially replaced with the italicized language "not amounting to [a] felony."

In *Dillon, supra*, 34 Cal.3d 441, this court considered issues concerning the first degree felony-murder rule. As part of its discussion, *Dillon* stated that the proviso portion of section 25 of the Act of 1850 "codified the common law felony-murder rule in this state," and that "the Legislature's decision not to reenact the felony-murder provision of section 25 in the 1872 codification implied an intent to abrogate the common law felony-murder rule that the section had embodied since 1850." (*Dillon, supra*, at pp. 465, 467.) If these

statements were correct, it would be difficult to conclude that second degree felony murder is based on statute today. But this language in *Dillon* was dicta because *Dillon* involved the first degree, not second degree, felony-murder rule. Now that the point is critical, we examine it further and, viewing the relevant 1850 and 1872 statutes in context, conclude that *Dillon* was not correct in this regard.

A codification of the felony-murder rule would logically be placed in the statutes defining murder, not in a statute defining involuntary manslaughter such as section 25 of the Act of 1850. Moreover, any reasonable felony-murder rule would apply to *any* killing during the course of a felony, not just an "involuntary killing" as stated in that same section 25. As *Dillon* noted, "It would have been absurd, of course, to punish as murder those killings [i.e., involuntary killings] but not 'voluntary' killings during a felony . . . ." (*Dillon, supra,* 34 Cal.3d at p. 465, fn. 12.) *Dillon* ascribed section 25's apparent limitation of the felony-murder rule to involuntary killings to a "quirk of draftsmanship." (*Dillon, supra,* at p. 465, fn. 12.) If that section's proviso is viewed as a codification of the common law of felony murder, the draftsmanship would, indeed, be quirky. It would be doubly quirky: It would be unusual to codify a common law rule concerning murder in a statute defining involuntary manslaughter, and it would be quirky to include in the felony-murder rule only involuntary killings to the apparent exclusion of voluntary killings. But viewed instead as what it no doubt was—a proviso merely limiting the scope of *involuntary manslaughter*—the draftsmanship makes sense.

Without the proviso, section 25 of the Act of 1850 would have meant, or at least would have been susceptible to the interpretation, that *any* killing "in the commission of an unlawful act"—i.e., *any* unlawful act, whether misdemeanor or felony—is involuntary manslaughter. The proviso simply makes clear that involuntary manslaughter does not include killings in the course of a felony, which remain murder. As this court explained in a case in which the crime was committed before, but the opinion filed after, adoption of the 1872 Penal Code, "Whenever one, in doing an act with the design of committing a felony, takes the life of another, even accidentally, this is murder." (*People v. Doyell, supra,* 48 Cal. at p. 94 [citing § 25 of the Act of 1850].) The new section 192 merely simplified the definition of involuntary manslaughter by replacing the earlier proviso with the new language, "not amounting to felony." In this way, the Legislature avoided the awkwardness of having a broad definition of involuntary manslaughter followed by a proviso limiting that definition. So viewed, the language of section 25 of the Act of 1850 and 1872's new section 192 all make sense; no need exists to ascribe any language to quirky draftsmanship or to view section 192's simplified definition of *involuntary manslaughter* as abrogating a common law rule concerning *murder*.

The notes of the California Code Commissioners accompanying the 1872 adoption of the Penal Code, which are entitled to substantial weight (*Keeler v. Superior Court, supra,* 2 Cal.3d at p. 630), provide no hint of an intent to abrogate the felony-murder rule. The note accompanying section 187, although not discussing this precise point, shows that the statutory term "malice aforethought" incorporated the term's common law meaning. (Code commrs., note foll., Ann. Pen. Code, § 187 (1st ed. 1872, Haymond & Burch, commrs. annotators) pp. 80–81 (1872 Code commissioners note) [citing various common law sources in discussing the meaning of malice aforethought].) Similarly, nothing in the adoption of sections 188 and 189 suggests an intent to change the then existing law of murder, including, as relevant here, the definition of implied malice and its common law antecedents. The code commissioners note accompanying the 1872 adoption of section 192 states that "[t]his section *embodies the material portions* of Sections 22, 23, 24, and 25 of the Crimes and Punishment Act of 1850." (1872 Code commrs. note, *supra,* p. 85, italics added.) This latter note strongly indicates that the language change from section 25 of the Act of 1850 to section 192 was not intended to change the law of manslaughter, much less to change the law of murder by abrogating the common law felony-murder rule. Any statute that "embodies the material portions" of predecessor statutes would not change the law in such a substantial manner.

We are unaware of any California case even remotely contemporaneous with the adoption of the 1872 Penal Code (i.e., any case before *Dillon, supra,* 34 Cal.3d 441) suggesting that the language change from section 25 of the Act of 1850 to section 192 abrogated the felony-murder rule or otherwise changed the law of murder. Indeed, cases postdating *People v. Doyell, supra,* 48 Cal. 85, and the adoption of the 1872 Penal Code, but still ancient from today's perspective, cited *Doyell* in applying the second degree felony-murder rule without any hint that *Doyell* was obsolete because it had cited section 25 of the Act of 1850. (See *People v. Olsen* (1889) 80 Cal. 122, 126–127 [22 P. 125]; *People v. Ferugia* (1928) 95 Cal.App. 711, 718 [273 P. 99]; *People v. Hubbard* (1923) 64 Cal.App. 27, 33 [220 P. 315].)

■ For these reasons, we conclude that the Legislature's replacement of the proviso language of section 25 of the Act of 1850 with the shorthand language "not amounting to felony" in section 192 did not imply an abrogation of the common law felony-murder rule. The "abandoned and malignant heart" language of both the original 1850 law and today's section 188 contains within it the common law second degree felony-murder rule. The willingness to commit a felony inherently dangerous to life is a

circumstance showing an abandoned and malignant heart. The second degree felony-murder rule is based on statute and, accordingly, stands on firm constitutional ground.[4]

### B. *The Merger Doctrine and Second Degree Felony Murder*

■ Although today we reaffirm the constitutional validity of the long-standing second degree felony-murder rule, we also recognize that the rule has often been criticized and, indeed, described as disfavored. (E.g., *Patterson, supra,* 49 Cal.3d at p. 621.) We have repeatedly stated, as recently as 2005, that the rule " ' "deserves no extension beyond its required application." ' " (*People v. Howard, supra,* 34 Cal.4th at p. 1135.) For these reasons, although the second degree felony-murder rule originally applied to all felonies (*People v. Doyell, supra,* 48 Cal. at pp. 94–95; Pike, *What Is Second Degree Murder in California?, supra,* 9 So.Cal. L.Rev. at pp. 118–119), this court has subsequently restricted its scope in at least two respects to ameliorate its perceived harshness.

First, "[i]n *People* v. *Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892], the court restricted the felonies that could support a conviction of second degree murder, based upon a felony-murder theory, to those felonies that are 'inherently dangerous to human life.' " (*Hansen, supra,* 9 Cal.4th at p. 308.) Whether a felony is inherently dangerous is determined from the elements of the felony in the abstract, not the particular facts. (*Patterson, supra,* 49 Cal.3d at p. 621.) This restriction is not at issue here. Section 246 makes it a felony to "maliciously and willfully discharge a firearm at an . . . occupied motor vehicle . . . ."[5] In *Hansen, supra,* at pages 309–311, we held that shooting at an "inhabited dwelling house" under section 246 is inherently dangerous even though the inhabited dwelling house does not have to be actually occupied at the time of the shooting. That being the case, shooting at a vehicle that is actually occupied clearly is inherently dangerous.

---

[4] For policy reasons, Justice Moreno would abolish the second degree felony-murder doctrine entirely. As we have explained, this court has long refused to abolish it because it is so firmly established in our law. We continue to abide by this long-established doctrine, especially now that we have shown that it is based on statute, while at the same time attempting to make it more workable.

[5] In its entirety, section 246 provides: "Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house, occupied building, occupied motor vehicle, occupied aircraft, inhabited housecar, as defined in Section 362 of the Vehicle Code, or inhabited camper, as defined in Section 243 of the Vehicle Code, is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for three, five, or seven years, or by imprisonment in the county jail for a term of not less than six months and not exceeding one year.

"As used in this section, 'inhabited' means currently being used for dwelling purposes, whether occupied or not."

But the second restriction—the "merger doctrine"—is very much at issue. The merger doctrine developed due to the understanding that the underlying felony must be an independent crime and not merely the killing itself. Thus, certain underlying felonies "merge" with the homicide and cannot be used for purposes of felony murder. The specific question before us is how to apply the merger doctrine. The Court of Appeal divided on the question and on how to apply our precedents. But the majority and dissent agreed on one thing— that the current state of the law regarding merger is "muddled." We agree that the scope and application of the merger doctrine as applied to second degree murder needs to be reconsidered. To explain this, we will first review the doctrine's historical development. Then we will discuss what to do with the merger doctrine and, ultimately, will conclude that the trial court should not have instructed on felony murder.

### 1. *Historical Review*

The merger doctrine arose in the seminal case of *Ireland, supra*, 70 Cal.2d 522, and hence sometimes is called the "*Ireland* merger doctrine." In *Ireland*, the defendant shot and killed his wife, and was convicted of second degree murder. The trial court instructed the jury on second degree felony murder with assault with a deadly weapon the underlying felony. We held the instruction improper, adopting the "so-called 'merger' doctrine" that had previously been developed in other jurisdictions. (*Id.* at p. 540.) We explained our reasons: "[T]he utilization of the felony-murder rule in circumstances such as those before us extends the operation of that rule 'beyond any rational function that it is designed to serve.' (*People v. Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130].) To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (*Id.* at p. 539.)[6]

We next confronted the merger doctrine in a second degree felony-murder case in *Mattison, supra*, 4 Cal.3d 177. As we later described *Mattison*'s facts,

---

[6] *Ireland, supra*, 70 Cal.2d 522, was a second degree murder case. The merger doctrine also has a first degree felony-murder counterpart. (See *People v. Wilson* (1969) 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22].) Because first degree felony murder is specifically proscribed by statute (§ 189), what we say about the second degree felony-murder rule does not necessarily apply to the first degree felony-murder rule.

"[i]n that case, the defendant and the victim both were inmates of a correctional institution. The defendant worked as a technician in the medical laboratory. He previously had offered to sell alcohol to inmates, leading the victim, an alcoholic, to seek alcohol from him. The defendant supplied the victim with methyl alcohol, resulting in the victim's death by methyl alcohol poisoning. [¶] At trial, the court instructed on felony murder based upon the felony of mixing poison with a beverage, an offense proscribed by the then current version of section 347 (' "Every person who wilfully mingles any poison with any food, drink or medicine, with intent that the same shall be taken by any human being to his injury, is guilty of a felony." ') (4 Cal.3d at p. 184.) The defendant was convicted of second degree murder." (*Hansen, supra,* 9 Cal.4th at p. 313.)

The *Mattison* defendant argued "that the offense of administering poison with the intent to injure is an 'integral part of' and 'included in fact within the offense' of murder by poison" within the meaning of *Ireland, supra,* 70 Cal.2d 522. (*Mattison, supra,* 4 Cal.3d at p. 185.) We disagreed. "The instant case . . . presents an entirely different situation from the one that confronted us in *Ireland.* The facts before us are very similar to *People* v. *Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697], in which the victim died as a result of an overdose of heroin which had been furnished to her by the defendant. The defendant was convicted of second degree murder and the question presented was whether application of the felony-murder rule constituted error under *Ireland. . . .* [T]he *Taylor* court concluded that application of the felony-murder rule was proper because the underlying felony was committed with a 'collateral and independent felonious design.' (*People* v. *Taylor, supra,* 11 Cal.App.3d 57, 63.) In other words the felony was not done with the intent to commit injury which would cause death. Giving a felony-murder instruction in such a situation serves rather than subverts the purpose of the rule. 'While the felony-murder rule can hardly be much of a deterrent to a defendant who has decided to assault his victim with a deadly weapon, it seems obvious that in the situation presented in the case at bar, it does serve a rational purpose: knowledge that the death of a person to whom heroin is furnished may result in a conviction for murder should have some effect on the defendant's readiness to do the furnishing.' (*People* v. *Taylor, supra,* 11 Cal.App.3d 57, 63.) The instant case is virtually indistinguishable from *Taylor,* and we hold that it was proper to instruct the jury on second degree felony murder." (*Mattison, supra,* 4 Cal.3d at pp. 185–186.)

In *People* v. *Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886], the defendant was convicted of the second degree murder of her two-year-old daughter. We had to decide whether the trial court correctly instructed the jury on second degree felony murder with felony child abuse (now § 273a, subd. (a)) the underlying felony. We reviewed some of the felonies that do not merge but found them distinguishable. (*People* v. *Smith, supra,* at p. 805.)

We explained that the crime at issue was "child abuse of the assaultive variety" for which we could "conceive of no independent purpose." (*Id.* at p. 806.) Accordingly, we concluded that the offense merged with the resulting homicide, and that the trial court erred in instructing on felony murder.

Our merger jurisprudence took a different turn in *Hansen, supra,* 9 Cal.4th 300. In that case, the defendant was convicted of second degree murder for shooting at a house, killing one person. The trial court instructed the jury on second degree felony murder, with discharging a firearm at an inhabited dwelling house (§ 246) the underlying felony. The majority concluded that the crime of discharging a firearm at an inhabited dwelling house "does not 'merge' with a resulting homicide so as to preclude application of the felony-murder doctrine." (*Hansen, supra,* at p. 304.) We noted that this court "has not extended the *Ireland* doctrine beyond the context of assault, even under circumstances in which the underlying felony plausibly could be characterized as 'an integral part of' and 'included in fact within' the resulting homicide." (*Id.* at p. 312.)

We discussed in detail *Mattison, supra,* 4 Cal.3d 177, and *People v. Taylor, supra,* 11 Cal.App.3d 57, the case *Mattison* relied on. We agreed with *Taylor*'s "rejection of the premise that *Ireland*'s 'integral part of the homicide' language constitutes the crucial test in determining the existence of merger. Such a test would be inconsistent with the underlying rule that only felonies 'inherently dangerous to human life' are sufficiently indicative of a defendant's culpable mens rea to warrant application of the felony-murder rule. [Citation.] The more dangerous the felony, the more likely it is that a death may result directly from the commission of the felony, but resort to the 'integral part of the homicide' language would preclude application of the felony-murder rule for those felonies that are most likely to result in death and that are, consequently, the felonies as to which the felony-murder doctrine is most likely to act as a deterrent (because the perpetrator could foresee the great likelihood that death may result, negligently or accidentally)." (*Hansen, supra,* 9 Cal.4th at p. 314.)

But the *Hansen* majority also disagreed with *People v. Taylor, supra,* 11 Cal.App.3d 57, in an important respect. We declined "to adopt as the critical test determinative of merger in all cases" language in *Taylor* indicating "that the rationale for the merger doctrine does not encompass a felony ' "committed with a collateral and independent felonious design." ' (*People v. Taylor, supra,* 11 Cal.App.3d at p. 63; see also *People v. Burton* (1971) 6 Cal.3d 375, 387 [99 Cal.Rptr. 1, 491 P.2d 793].) Under such a test, a felon who acts with a purpose other than specifically to inflict injury upon someone—for example, with the intent to sell narcotics for financial gain, or to discharge a firearm at a building solely to intimidate the occupants—is subject to greater

criminal liability for an act resulting in death than a person who actually intends to injure the person of the victim. Rather than rely upon a somewhat artificial test that may lead to an anomalous result, we focus upon the principles and rationale underlying the foregoing language in *Taylor*, namely, that with respect to certain inherently dangerous felonies, their use as the predicate felony supporting application of the felony-murder rule will not elevate all felonious assaults to murder or otherwise subvert the legislative intent." (*Hansen, supra*, 9 Cal.4th at p. 315.)

*Hansen* went on to explain that "application of the second degree felony-murder rule would not result in the subversion of legislative intent. Most homicides do not result from violations of section 246, and thus, unlike the situation in *People* v. *Ireland, supra*, 70 Cal.2d 522, application of the felony-murder doctrine in the present context will not have the effect of 'preclud[ing] the jury from considering the issue of malice aforethought . . . [in] the great majority of all homicides.' (*Id.*, at p. 539.) Similarly, application of the felony-murder doctrine in the case before us would not frustrate the Legislature's deliberate calibration of punishment for assaultive conduct resulting in death, based upon the presence or absence of malice aforethought. . . . [T]his is not a situation in which the Legislature has demanded a showing of actual malice (apart from the statutory requirement that the firearm be discharged 'maliciously and willfully') in order to support a second degree murder conviction. Indeed, as discussed above, application of the felony-murder rule, when a violation of section 246 results in the death of a person, clearly is consistent with the traditionally recognized purpose of the second degree felony-murder doctrine—namely the deterrence of negligent or accidental killings that occur in the course of the commission of dangerous felonies." (*Hansen, supra*, 9 Cal.4th at p. 315.)

*Hansen* generated three separate opinions in addition to the majority opinion. Justice Werdegar authored a concurring opinion arguing that the operative test for the merger doctrine is "whether the underlying felony was committed with a 'collateral and independent felonious design.' " (*Hansen, supra*, 9 Cal.4th at p. 318.) She concurred in the judgment because "[t]he evidence in this case supports the conclusion defendant entertained a collateral and independent felonious design under *Mattison* and *Taylor*, namely to intimidate Echaves by firing shots into his house." (*Ibid.*)

Justices Mosk and Kennard each authored separate concurring and dissenting opinions. They would have concluded that the underlying felony merged with the resulting homicide, thus precluding use of the felony-murder rule. Justice Kennard argued that "the prosecution's evidence did not show that defendant had any independent felonious purpose for discharging the firearm at the Echaves residence. That conduct satisfies this court's definition of an assault." (*Hansen, supra*, 9 Cal.4th at p. 330.)

*People v. Tabios* (1998) 67 Cal.App.4th 1 [78 Cal.Rptr.2d 753] involved the same issue as this case—whether shooting at an occupied vehicle under section 246 merges with the underlying homicide. Relying on *Hansen, supra,* 9 Cal.4th 300, the Court of Appeal found no merger. (*People v. Tabios, supra,* at p. 11.)

In *Robertson, supra,* 34 Cal.4th 156, the issue was whether the trial court properly instructed the jury on felony murder based on discharging a firearm in a grossly negligent manner. (§ 246.3.) As we later summarized, "[t]he defendant in *Robertson* claimed he fired into the air, in order to frighten away several men who were burglarizing his car." (*People v. Randle* (2005) 35 Cal.4th 987, 1005 [28 Cal.Rptr.3d 725, 111 P.3d 987] (*Randle*).) *Robertson* concluded that the merger doctrine did not bar a felony-murder instruction. (*Robertson, supra,* at p. 160.) Its reasons, however, were quite different than *Hansen's* reasons.

The *Robertson* majority reviewed some of the cases discussed above, then focused on *Mattison, supra,* 4 Cal.3d 177. We said that the *Mattison* court believed that finding no merger under its facts "was consistent with the deterrent purpose of the felony-murder rule, because we envisioned that application of the felony-murder rule would deter commission of the underlying inherently dangerous crime. (*Id.* at pp. 185–186.) Although a person who has decided to assault another would not be deterred by the felony-murder rule, we declared, a defendant with some collateral purpose may be deterred. The knowledge that a murder conviction may follow if an offense such as furnishing a controlled substance or tainted alcohol causes death ' "should have some effect on the defendant's readiness to do the furnishing." ' (*Id.* at p. 185.)" (*Robertson, supra,* 34 Cal.4th at pp. 170–171.)

We noted that *Mattison, supra,* 4 Cal.3d 177, focused on the fact that the underlying felony's purpose "was independent of or collateral to an intent to cause injury that would result in death." (*Robertson, supra,* 34 Cal.4th at p. 171.) Then we explained, "Although the collateral purpose rationale may have its drawbacks in some situations (*Hansen, supra,* 9 Cal.4th at p. 315), we believe it provides the most appropriate framework to determine whether, under the facts of the present case, the trial court properly instructed the jury. The defendant's asserted underlying purpose was to frighten away the young men who were burglarizing his automobile. According to defendant's own statements, the discharge of the firearm was undertaken with a purpose collateral to the resulting homicide, rendering the challenged instruction permissible. As Justice Werdegar pointed out in her concurring opinion in *Hansen,* a defendant who discharges a firearm at an inhabited dwelling house, for example, has a purpose independent from the commission of a resulting

homicide if the defendant claims he or she shot to intimidate, rather than to injure or kill the occupants. (*Hansen, supra,* 9 Cal.4th at p. 318 (conc. opn. of Werdegar, J.).)" (*Ibid.*)

In *Robertson,* the Court of Appeal had said "that application of the merger doctrine was necessary in order to avoid the absurd consequence that '[d]efendants who admit an intent to kill, but claim to have acted with provocation or in honest but unreasonable self-defense, would likely have a stronger chance [than defendants who claimed "I didn't mean to do it"] of being convicted of the lesser offense of voluntary manslaughter.' " (*Robertson, supra,* 34 Cal.4th at pp. 172–173.) We responded: "The asserted anomaly identified by the Court of Appeal is characteristic of the second degree felony-murder rule in general and is inherent in the doctrine's premise that it is reasonable to impute malice—or, more precisely, to eliminate consideration of the presence or absence of actual malice—because of the defendant's commission of an underlying felony that is inherently and foreseeably dangerous. [Citations.] Reliance on section 246.3 as the predicate offense presents no greater anomaly in this regard than such reliance on any other inherently dangerous felony." (*Id.* at p. 173.)

Thus, the *Robertson* majority abandoned the rationale of *Hansen, supra,* 9 Cal.4th 300, and resurrected the collateral purpose rationale of *Mattison, supra,* 4 Cal.3d 177, at least when the underlying felony is a violation of section 246.3.

*Robertson* generated four separate opinions in addition to the majority opinion. Justice Moreno's concurring opinion agreed that the refusal to apply the merger doctrine was correct under the current state of the law, but he was concerned whether the court should continue to adhere to the second degree felony-murder doctrine at all. (*Robertson, supra,* at pp. 174–177.) Justice Brown argued in dissent that the second degree felony-murder rule should be abandoned entirely. (*Robertson, supra,* 34 Cal.4th at pp. 186–192.)

In a separate dissent, Justice Kennard disagreed that "defendant's claimed objective to scare the victim" was "a felonious purpose that was *independent of* the killing." (*Robertson, supra,* 34 Cal.4th at p. 178.) She noted with approval that "the majority, without explanation, abandon[ed] the rationale of the *Hansen* majority, and it return[ed] to the independent felonious purpose standard, which it had criticized in *Hansen, supra,* 9 Cal.4th 300." (*Id.* at p. 180.) That was the test she had advocated in *Hansen.* (*Ibid.*) But she believed that the majority misapplied that test. "An intent to scare a person by shooting at the person is *not independent* of the homicide because it is, in essence, nothing more than the intent required for an assault, which is not considered an independent felonious purpose. [Citation.] Two examples of

independent felonious purpose come to mind: (1) When the felony underlying the homicide is manufacturing methamphetamine, the intent to manufacture this illegal drug is a felonious intent that is independent of the homicide, thus allowing the manufacturer to be convicted of murder if the methamphetamine laboratory explodes and kills an innocent bystander. (2) When the underlying felony is possession of a destructive device, the intent to possess that device is an independent felonious intent, allowing the possessor to be convicted of murder if the device accidentally explodes, killing an unintended victim. But when, as here, a defendant fires a gun to scare the victim, the intended harm—that of scaring the victim—is not independent of the greater harm that occurs when a shot fired with the intent to scare instead results in the victim's death." (*Id.* at p. 183.) "In sum, it makes no sense legally to treat defendant's alleged intent to scare as 'felonious' when such an intent is legally irrelevant [to guilt of the underlying felony] and when the jury never decided whether he had that intent." (*Ibid.*)

Justice Werdegar also dissented, arguing that the underlying felony merged with the resulting homicide. She said she "would like to join in the majority reasoning, which is consistent with my *Hansen* concurrence. But sometimes consistency must yield to a better understanding of the developing law. The anomalies created when assaultive conduct is used as the predicate for a second degree felony-murder theory (see dis. opn. of Kennard, J., *ante*, at pp. 180–182) are too stark and potentially too productive of injustice to be written off as 'characteristic of the second degree felony-murder rule in general' (maj. opn., *ante*, at p. 173). It simply cannot be the law that a defendant who shot the victim with the intent to kill or injure, but can show he or she acted in unreasonable self-defense, may be convicted of only voluntary manslaughter, whereas a defendant who shot only to scare the victim is precluded from raising that partial defense and is strictly liable as a murderer. The independent and collateral purposes referred to in *Mattison* must be understood as limited to nonassaultive conduct. In circumstances like the present, the merger doctrine should preclude presentation of a second degree felony-murder theory to the jury." (*Robertson, supra,* 34 Cal.4th at p. 185 (dis. opn. of Werdegar, J.).)

In *Randle, supra,* 35 Cal.4th 987, the trial court, as in *Robertson,* instructed the jury on second degree felony murder, with discharging a firearm in a grossly negligent manner the underlying felony. (*Randle, supra,* at p. 1004.) We found the instruction erroneous under the facts. "Here, unlike *Robertson,* defendant admitted, in his pretrial statements to the police and to a deputy district attorney, he shot *at* Robinson [the homicide victim]. . . . [¶] The fact that defendant admitted shooting at Robinson distinguishes *Robertson* and supports application of the merger rule here. Defendant's claim that he shot Robinson in order to rescue [another person] simply provided a *motive* for the shooting; it was not a purpose independent of the shooting." (*Id.* at p. 1005.)

In *People v. Bejarano* (2007) 149 Cal.App.4th 975 [57 Cal.Rptr.3d 486], as in *People v. Tabios, supra*, 67 Cal.App.3d 1, and this case, the trial court instructed the jury on second degree felony murder, with shooting at an occupied vehicle under section 246 the underlying felony. The court concluded that the collateral purpose requirement of *Robertson, supra*, 34 Cal.4th 156, and *Randle, supra*, 35 Cal.4th 987, applied. "The facts of this case show that appellant discharged the firearm once, intending to shoot the motor vehicle's occupants, rival gang members, and not intending merely to frighten them. The bullet, however, struck and killed an unintended victim, the driver of another vehicle." (*People v. Bejarano, supra*, at p. 978.) Relying primarily on *Randle, supra*, 35 Cal.4th 987, the Court of Appeal concluded that the trial court erred in instructing on felony murder. "Thus, *Randle* controls this case, the predicate felony merged with the homicide, and the trial court erred in instructing the jury on second degree felony murder based on discharging a firearm at an occupied motor vehicle in violation of section 246." (*People v. Bejarano, supra*, at p. 990.)

The most recent significant development is the Court of Appeal's opinion in this case. The majority noted that *People v. Tabios, supra*, 67 Cal.App.4th 1, had relied on *Hansen, supra*, 9 Cal.4th 300, in finding no merger, but then it also noted that this court "returned to the *Mattison* collateral purpose rationale in" *Robertson, supra*, 34 Cal.4th 156. After reviewing other recent cases, it stated, "From this muddled state of the law, we discern the rule to be that second degree felony murder is applicable to an assaultive-type crime, such as when shooting at a person is involved, provided that the crime was committed with a purpose independent of and collateral to causing injury. Since the Supreme Court could have upheld instruction on felony murder in *Randle* on the basis that most homicides are not committed by negligently discharging a gun and did not, we conclude the collateral purpose rule is the proper test of merger in these types of cases."

Regarding whether a collateral purpose exists in this case, the Court of Appeal majority noted that it had held defendant's statement that he had fired the gun " 'to scare them' " should have been excluded. "Without defendant's statements about firing the gun," the majority concluded, "there was no admissible evidence of a collateral purpose by defendant or any of his companions. Indeed, the reasonable inference is that one who shoots another at close range intends to harm, if not to kill." Thus it found the court erred, prejudicially, in instructing on second degree felony murder.

In dissent, Justice Nicholson agreed with the majority that the present state of the law is muddled. But he concluded that this court has not overruled *Hansen, supra*, 9 Cal.4th 300, and found that case, rather than *Robertson, supra*, 34 Cal.4th 156, or *Randle, supra*, 35 Cal.4th 987, to be on point. He

believed that "the only rule that can be gleaned from *Robertson* and *Randle* is that the collateral purpose rationale applies to cases involving a violation of section 246.3, which this case does not." Accordingly, he would have held "that merger is inappropriate when the underlying offense is a violation of section 246."

### 2.   *Analysis*

The current state of the law regarding the *Ireland* merger doctrine is problematic in at least two respects.

First, two different approaches currently exist in determining whether a felony merges. *Hansen, supra,* 9 Cal.4th 300, which we have never expressly overruled, held that a violation of section 246, at least when predicated on shooting at an inhabited dwelling house, *never* merges. *Robertson, supra,* 34 Cal.4th 156, and *Randle, supra,* 35 Cal.4th 987, held that a violation of section 246.3 *does* merge unless it is done with a purpose collateral to the resulting homicide. If *Hansen,* on the one hand, and *Robertson* and *Randle* on the other hand, are all still valid authority, the question arises which approach applies here. *People v. Tabios, supra,* 67 Cal.App.4th 1, relied on *Hansen* to conclude that shooting at an occupied vehicle under section 246 never merges. *People v. Bejarano, supra,* 149 Cal.App.4th 975, relied on the more recent *Robertson* and *Randle* opinions to conclude that the same felony *does* merge unless accompanied by a collateral purpose. The Court of Appeal here, rather understandably, divided on the question. This court has never explained whether *Hansen* retains any viability after *Robertson* and *Randle* and, if so, how a court is to go about determining which approach to apply to a given underlying felony.

Second, *Randle,* when juxtaposed with *Robertson,* brings into sharp focus the anomaly that we noted in *Robertson* and accepted as inherent in the second degree felony-murder rule, and that we noted in *Hansen* and avoided by concluding that the merger doctrine never applies to shooting at an inhabited dwelling house. In combination, *Robertson* and *Randle* hold that, when the *Hansen* test does not apply (i.e., at least when the underlying felony is a violation of § 246.3), the underlying felony merges, and the felony-murder rule does *not* apply, if the defendant intended to shoot *at* the victim (*Randle*), but the underlying felony does not merge, and the felony-murder rule *does* apply, if the defendant merely intended to frighten, perhaps because he believed the victim was burglarizing his car (*Robertson*). This result is questionable for the reasons discussed in the separate opinions in *Robertson.* Moreover, as we discuss further below, the *Robertson* and *Randle* approach injected a factual component into the merger question that did not previously exist.

■ In light of these problems, we conclude we need to reconsider our merger doctrine jurisprudence. As Justice Werdegar observed in her dissenting opinion in *Robertson*, "sometimes consistency must yield to a better understanding of the developing law." (*Robertson, supra*, 34 Cal.4th at p. 185.) In considering this question, we must also keep in mind the purposes of the second degree felony-murder rule. We have identified two. The purpose we have most often identified "is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit." (*People v. Washington, supra*, 62 Cal.2d at p. 781.) Another purpose is to deter commission of the inherently dangerous felony itself. (*Robertson, supra*, 34 Cal.4th at p. 171 ["the second degree felony-murder rule is intended to deter both carelessness in the commission of a crime and the commission of the inherently dangerous crime itself"]; *Hansen, supra*, 9 Cal.4th at pp. 310–311, 314.)

We first consider whether *Hansen, supra*, 9 Cal.4th 300, has any continuing vitality after *Robertson, supra*, 34 Cal.4th 156, and *Randle, supra*, 35 Cal.4th 987. In *Robertson* and *Randle*, we unanimously rejected the *Hansen* test, at least when the underlying felony is a violation of section 246.3. Although *Hansen* avoided the problems inherent in the *Robertson* approach by simply stating the felony at issue will never merge, we see no basis today to resurrect the *Hansen* approach for a violation of section 246.3. Indeed, doing so would arguably be inconsistent with *Hansen*'s reasoning. *Hansen* explained that most homicides do not involve violations of section 246, and thus holding that such homicides do not merge would not "subvert the legislative intent." (*Hansen, supra*, at p. 315.) But most fatal shootings, and certainly those charged as murder, do involve discharging a firearm in at least a grossly negligent manner. Fatal shootings, in turn, are a high percentage of all homicides. Thus, holding that a violation of section 246.3 never merges would greatly expand the range of homicides subject to the second degree felony-murder rule. We adhere to *Robertson* and *Randle* to the extent they declined to extend the *Hansen* approach to a violation of section 246.3.

■ But if, as we conclude, the *Hansen* test does not apply to a violation of section 246.3, we must decide whether it still applies to *any* underlying felonies. The tests stated in *Hansen* and in *Robertson* and *Randle* cannot both apply at the same time. If *Hansen* governs, the underlying felony will *never* merge. If *Robertson* and *Randle* govern, the underlying felony will *always* merge unless the court can discern some independent felonious purpose. But we see no principled basis by which to hold that a violation of section 246 never merges, but a violation of section 246.3 does merge unless done with an independent purpose. We also see no principled test that another court could use to determine which approach applies to other possible underlying felonies. The court in *People v. Bejarano, supra*, 149 Cal.App.4th 975, implicitly concluded that *Robertson* and *Randle* now govern to the exclusion

of the *Hansen* test. We agree. The *Robertson* and *Randle* test and the *Hansen* test cannot coexist. Our analyses in *Robertson* and *Randle* implicitly overruled the *Hansen* test. We now expressly overrule *People v. Hansen, supra*, 9 Cal.4th 300, to the extent it stated a test different than the one of *Robertson* and *Randle*. Doing so also requires us to disapprove of *People v. Tabios, supra*, 67 Cal.App.4th 1.

But the test of *Robertson, supra*, 34 Cal.4th 156, and *Randle, supra*, 35 Cal.4th 987, has its own problems that were avoided in *Hansen* but resurfaced when we abandoned the *Hansen* test. Our holding in *Randle* made stark the anomalies that Justices Kennard and Werdegar identified in *Robertson*. On reflection, we do not believe that a person who claims he merely wanted to frighten the victim should be subject to the felony-murder rule (*Robertson*), but a person who says he intended to shoot at the victim is not subject to that rule (*Randle*). Additionally, *Robertson* said that the intent to frighten is a collateral *purpose*, but *Randle* said the intent to rescue another person is not an independent purpose but merely a *motive*. (*Robertson, supra*, at p. 171; *Randle, supra*, at p. 1005.) It is not clear how a future court should decide whether a given intent is a purpose or merely a motive.

The *Robertson* and *Randle* test presents yet another problem. In the past, we have treated the merger doctrine as a legal question with little or no factual content. Generally, we have held that an underlying felony either never or always merges (e.g., *People v. Smith, supra*, 35 Cal.3d at p. 805 [identifying certain underlying felonies that do not merge]), not that the question turns on the specific facts. Viewed as a legal question, the trial court properly decides whether to instruct the jury on the felony-murder rule, but if it does so instruct, it does not also instruct the jury on the merger doctrine. The *Robertson* and *Randle* test, however, turns on potentially disputed facts specific to the case. In *Robertson*, the defendant claimed he merely intended to frighten the victim, which caused this court to conclude the underlying felony did not merge. But the jury would not necessarily have to believe the defendant. Whether a defendant shot *at* someone intending to injure, or merely tried to frighten that someone, may often be a disputed factual question.

Defendant argues that the factual question whether the defendant had a collateral felonious purpose—and thus whether the felony-murder rule applies—involves an element of the crime and, accordingly, that the *jury* must decide that factual question. When the merger issue turns on potentially disputed factual questions, there is no obvious answer to this argument. Justice Kennard alluded to the problem in her dissent in *Robertson* when she observed that "the jury never decided whether he had that intent [to frighten]." (*Robertson, supra*, 34 Cal.4th at p. 183.) Because this factual

question determines whether the felony-murder rule applies under *Robertson* and *Randle*, and thus whether the prosecution would have to prove some other form of malice, it is not clear why the jury should not have to decide the factual question.

■ To avoid the anomaly of putting a person who merely intends to frighten the victim in a worse legal position than the person who actually intended to shoot at the victim, and the difficult question of whether and how the jury should decide questions of merger, we need to reconsider our holdings in *Robertson, supra*, 34 Cal.4th 156, and *Randle, supra*, 35 Cal.4th 987. When the underlying felony is assaultive in nature, such as a violation of section 246 or 246.3, we now conclude that the felony merges with the homicide and cannot be the basis of a felony-murder instruction. An "assaultive" felony is one that involves a threat of immediate violent injury. (See *People v. Chance* (2008) 44 Cal.4th 1164, 1167–1168 [81 Cal.Rptr.3d 723].) In determining whether a crime merges, the court looks to its elements and not the facts of the case. Accordingly, if the elements of the crime have an assaultive aspect, the crime merges with the underlying homicide even if the elements also include conduct that is not assaultive. For example, in *People v. Smith, supra*, 35 Cal.3d at page 806, the court noted that child abuse under section 273a "includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect." Looking to the facts before it, the court decided the offense was "of the assaultive variety," and therefore merged. (*Smith, supra*, 35 Cal.3d at pp. 806–807.) It reserved the question whether the nonassaultive variety would merge. (*Id.* at p. 808, fn. 7.) Under the approach we now adopt, both varieties would merge. This approach both avoids the necessity of consulting facts that might be disputed and extends the protection of the merger doctrine to the potentially less culpable defendant whose conduct is not assaultive.

This conclusion is also consistent with our repeatedly stated view that the felony-murder rule should not be extended beyond its required application. (*People v. Howard, supra*, 34 Cal.4th at p. 1135.) We do not have to decide at this point exactly what felonies are assaultive in nature, and hence may not form the basis of a felony-murder instruction, and which are inherently collateral to the resulting homicide and do not merge. But shooting at an occupied vehicle under section 246 is assaultive in nature and hence cannot serve as the underlying felony for purposes of the felony-murder rule.[7]

---

[7] Justice Baxter makes some provocative arguments in favor of abolishing the *Ireland* merger doctrine entirely. However, just as we have refused to abolish the second degree felony-murder doctrine because it is firmly established, so too we think it a bit late to abolish the four-decades-old merger doctrine. Instead, we think it best to attempt to make it and the second degree felony-murder doctrine more workable.

We overrule *People v. Robertson, supra*, 34 Cal.4th 156, and the reasoning, although not the result, of *People v. Randle, supra*, 35 Cal.4th 987. This conclusion means the trial court erred in this case in instructing the jury on the second degree felony-murder rule.[8] We now turn to a consideration of whether this error was prejudicial.

### C. *Prejudice*

California Constitution, article VI, section 13, prohibits a reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial. Accordingly, we must decide whether the error in instructing on felony murder prejudiced defendant.

Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict. (*People v. Cross* (2008) 45 Cal.4th 58, 69–71 [82 Cal.Rptr.3d 373, 190 P.3d 706] (conc. opn. of Baxter, J.); *People v. Swain* (1996) 12 Cal.4th 593, 607 [49 Cal.Rptr.2d 390, 909 P.2d 994]; *People v. Calderon* (2005) 129 Cal.App.4th 1301, 1306–1307 [29 Cal.Rptr.3d 277] [erroneous instruction on the second degree felony-murder rule]; see *Hedgpeth v. Pulido* (2008) 555 U.S. ___ [172 L.Ed.2d 388, 129 S.Ct. 530] [reiterating that error of this nature is subject to harmless error analysis]; *Neder v. United States* (1999) 527 U.S. 1, 15 [144 L.Ed.2d 35, 119 S.Ct. 1827] [stating the reasonable doubt test].)

In finding prejudice, the Court of Appeal noted that the trial court "did not give CALJIC No. 8.30 on second degree express malice murder or CALJIC No. 8.31 on second degree implied malice murder." It also stated, "While it is possible the jury selected second degree murder on another theory after finding no premeditation and deliberation, we cannot determine which theory the jury relied on, so if the second degree felony-murder instruction was legally flawed, the verdict must be reversed. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [17 Cal.Rptr.2d 365, 847 P.2d 45].)" Later, after it did find error, the court reiterated that the error was prejudicial: "Since . . . the record does not show the murder conviction was based on a valid ground, we reverse the conviction for second degree murder. (*People v. Guiton, supra*, 4 Cal.4th 1116, 1129.)"

---

[8] When we say the trial court erred, we mean, of course, only in light of our reconsideration of past precedents. As of the time of trial, after *Hansen, supra*, 9 Cal.4th 300, and *People v. Tabios, supra*, 67 Cal.App.4th 1, and before *People v. Bejarano, supra*, 149 Cal.App.4th 975, ample authority supported the trial court's decision to instruct on felony murder.

Defendant argues that the trial court did not adequately instruct the jury on conscious-disregard-for-life malice as a theory of second degree murder, and therefore the jury could not have based its verdict on that theory. We disagree. Although the trial court did not give CALJIC Nos. 8.30 and 8.31, and hence did not instruct on implied (or express) malice murder precisely the way the authors of CALJIC intended, it did give CALJIC No. 8.11, which contains everything necessary to fully instruct the jury on this form of malice as a possible theory of second degree murder.

Specifically, the court instructed the jury that to prove murder, the prosecution had to prove an unlawful killing that "was done with malice aforethought *or* occurred during the commission or attempted commission of shooting at an occupied motor vehicle . . . ." (Italics added.) It also defined malice: "Malice may be either express or implied. Malice is express when there is manifested an intention unlawfully to kill a human being.

"Malice is implied when:

"1. The killing resulted from an intentional act;

"2. The natural consequences of the act are dangerous to human life; and

"3. The act was deliberately performed with knowledge of the danger to and with conscious disregard for human life.

"When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought."

As the Attorney General notes, the only language from CALJIC No. 8.30 or No. 8.31 not included in CALJIC No. 8.11, which the court gave, is the last sentence of CALJIC No. 8.31: "When the killing is the direct result of such an act [an act committed with implied malice], it is not necessary to prove that the defendant intended that the act would result in the death of a human being." But omission of this sentence, favorable to the prosecution, could neither have prejudiced defendant nor prevented the jury from finding implied malice.

Later, the court instructed the jury that a killing during the commission of shooting at an occupied motor vehicle is second degree murder "when the perpetrator had the specific intent to commit that crime." The trial court did not reiterate at this point the conscious-disregard-for-life theory of second degree murder, but doing so was not necessary to adequately instruct the jury on that theory. The instructions permitted the jury to base a second degree

murder verdict on either malice *or* the felony-murder rule. Accordingly, the court *did* instruct the jury on conscious-disregard-for-life malice as a possible basis of murder.

Moreover, the prosecutor explained the applicable law to the jury. He explained that murder was an unlawful killing committed with malice *or* during the commission of a dangerous felony. He discussed what implied malice is and included examples. Defendant correctly notes that the prosecutor did not argue that defendant acted with implied malice. He argued for first degree, not second degree, murder. But the instructions, especially in light of the prosecutor's explanation, permitted the jury to base a second degree murder verdict on a finding of malice separate from the felony-murder rule.

In this situation, to find the error harmless, a reviewing court must conclude, beyond a reasonable doubt, that the jury based its verdict on a legally valid theory, i.e., either express or conscious-disregard-for-life malice. Citing *People v. Guiton, supra*, 4 Cal.4th 1116, the Court of Appeal believed it could not do so. But *Guiton* does not dispose of this issue. In his concurring opinion in *People v. Cross, supra*, 45 Cal.4th at page 70, Justice Baxter discussed *Guiton*'s significance in this context: "Although *Guiton* observed that reliance on other portions of the verdict is '[o]ne way' of finding an instructional error harmless (*Guiton*, at p. 1130), we have never intimated that this was the *only* way to do so. Indeed, *Guiton* noted that we were not then presented with the situation of a jury having been instructed with a legally adequate and a legally inadequate theory and that we therefore 'need not decide the exact standard of review' in such circumstances— although we acknowledged that '[t]here may be additional ways by which a court can determine that error in [this] situation is harmless. We leave the question to future cases.' (*Id.* at pp. 1130, 1131.) Because this case only now presents that issue, *Guiton* does not provide a dispositive answer to the question." (See also *People v. Harris* (1994) 9 Cal.4th 407, 419, fn. 7 [37 Cal.Rptr.2d 200, 886 P.2d 1193].)

The Attorney General argues that the actual verdict *does* show that the jury did not base its murder verdict on the felony-murder rule but necessarily based it on a valid theory. He notes that the jury *acquitted* defendant of the separately charged underlying crime of shooting at an occupied vehicle. A jury that based a murder verdict solely on felony murder, the Attorney General argues, would not acquit a defendant of the underlying felony. Defendant counters with the argument that the verdict as a whole—finding defendant guilty of murder but *not* guilty of either shooting at or from a motor vehicle—is internally inconsistent. On these facts, it is hard to reconcile this verdict. If defendant did not commit *this* murder by firing at or from a vehicle, how *did* he commit it? There was no evidence the victims

were killed or injured by any method other than shooting from *and* at an occupied vehicle. The overall verdict had to have been either a compromise or an act of leniency.

Defendant recognizes that he may not argue that the murder conviction must be reversed due to this inconsistency. He may not argue that the acquittals imply that defendant could not have committed murder, and therefore the jury found he did not commit murder. Instead, courts necessarily tolerate, and give effect to all parts of, inconsistent verdicts. (See generally *People v. Palmer* (2001) 24 Cal.4th 856 [103 Cal.Rptr.2d 13, 15 P.3d 234].) But, defendant argues, this being the case, a reviewing court should not read more than is warranted into one part of an inconsistent verdict. Defendant posits the possibility that one or more jurors found him guilty of second degree murder on a felony-murder theory but then agreed to acquit him of the underlying felony either out of leniency or as a compromise, or perhaps simply out of confusion. In that event, defendant suggests, those jurors may simply have believed defendant was guilty of murder on the invalid felony-murder theory without ever considering a valid theory of malice.

Defendant's argument has some force. The acquittal of the underlying felony strongly suggests the jury based its murder conviction on a valid theory of malice but, under the circumstances, we do not believe that it alone does so beyond a reasonable doubt. But for other reasons we find the error harmless. In his concurring opinion in *California v. Roy* (1996) 519 U.S. 2 [136 L.Ed.2d 266, 117 S.Ct. 337], Justice Scalia stated a test that fits the error of this case well. In *Roy*, the error was permitting a defendant to be convicted of a crime as an aider and abettor solely due to the defendant's *knowledge* of the perpetrator's intent without requiring a finding the aider and abettor shared that intent. That error is similar to the error of this case, which permitted defendant to be convicted of murder on a felony-murder theory without requiring a finding of a valid theory of malice. The high court held that the error was subject to harmless error analysis and remanded for the lower court to engage in that analysis.

*California v. Roy, supra*, 519 U.S. 2, involved collateral review of a state court judgment in a federal habeas corpus matter, a procedural posture in which the standard of review for prejudice is more deferential than the harmless-beyond-a-reasonable-doubt standard applicable to direct review. (*Id.* at pp. 4–5.) But Justice Scalia, in a concurring opinion, stated a test that is adaptable to the reasonable doubt standard of direct review: "The error in the present case can be harmless only if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well." (*Id.* at p. 7.) Without holding that this is the only way to find error harmless, we

think this test works well here, and we will use it. If other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary for conscious-disregard-for-life malice, the erroneous felony-murder instruction was harmless.

For felony murder, the court's instructions required the jury to find that defendant had the *specific intent* to commit the underlying felony of shooting at an occupied vehicle. Later, it instructed that to find defendant committed that crime, the jury had to find these elements:

"1. A person discharged a firearm at an occupied motor vehicle; and

"2. The discharge of the firearm was willful and malicious."

██ Thus any juror who relied on the felony-murder rule necessarily found that defendant willfully shot at an occupied vehicle. The undisputed evidence showed that the vehicle shot at was occupied by not one but three persons. The three were hit by multiple gunshots fired at close range from three different firearms. No juror could have found that defendant participated in this shooting, either as a shooter or as an aider and abettor, without also finding that defendant committed an act that is dangerous to life and did so knowing of the danger and with conscious disregard for life—which is a valid theory of malice. In other words, on this evidence, no juror could find felony murder without also finding conscious-disregard-for-life malice. The error in instructing the jury on felony murder was, by itself, harmless beyond a reasonable doubt.

However, this instructional error is not the only error in the case. The Court of Appeal held that the jury should not have heard evidence that defendant admitted firing the gun, but said he did not point it at anyone and just wanted to scare them, and that this error was harmless "as a pure evidentiary matter." Neither of these holdings is before us on review. The Court of Appeal also held that the error in instructing on felony murder was, by itself, prejudicial, a holding we are reversing. But the Court of Appeal never considered whether the two errors, *in combination*, were prejudicial. The parties have, understandably, not focused on this precise question. Under the circumstances, we think it prudent to remand the matter for the Court of Appeal to consider and decide whether the two errors, in combination, were prejudicial.

## III. CONCLUSION

Although we agree with the Court of Appeal that the trial court erred in instructing the jury on second degree felony murder, we also conclude that

the error, alone, was harmless. Accordingly, we reverse the judgment of the Court of Appeal and remand the matter to that court for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Werdegar, J., and Corrigan, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—I concur in the majority's decision to reaffirm the constitutional validity of the long-standing second degree felony-murder rule. (Maj. opn., *ante*, at pp. 1187–1188.) Ever since the Penal Code[1] was enacted in 1872, and going back even before that, to California's first penal law, the Crimes and Punishments Act of 1850 (Stats. 1850, ch. 99, p. 229), the second degree felony-murder rule has been recognized as a rule for imputing malice under the statutory definition of implied malice (§ 188)[2] where the charge is second degree murder. (Maj. opn., *ante*, at pp. 1184–1188.) As the majority explains, "The willingness to commit a felony inherently dangerous to life is a circumstance showing an abandoned and malignant heart. The second degree felony-murder rule is based on statute and, accordingly, stands on firm constitutional ground." (Maj. opn., *ante*, at pp. 1187–1188.)

Although the majority reaffirms the constitutional validity of the second degree felony-murder rule, it goes on to render the rule useless in this and future cases out of strict adherence to the so-called "merger doctrine" announced in *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580] (*Ireland*). Under the merger doctrine, no assaultive-type felony can be used as a basis for a second degree felony-murder conviction. The single rationale given in *Ireland* for the merger doctrine was that to allow assaultive-type felonies to serve as a basis for a second degree felony-murder conviction "would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault . . . a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law." (*Id.* at p. 539.)

---

[1] All further statutory references are to the Penal Code.

[2] Section 188 provides that malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188.) We have, however, recognized that "[t]he statutory definition of implied malice has never proved of much assistance in defining the concept in concrete terms." (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1217 [264 Cal.Rptr. 841, 783 P.2d 200] (*Dellinger*).) Under the modern understanding of the "abandoned and malignant heart" definition of implied malice, malice is presumed when " ' "the killing proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Id.* at p. 1218; see also *People v. Sedeno* (1974) 10 Cal.3d 703, 719 [112 Cal.Rptr. 1, 518 P.2d 913]; *People v. Phillips* (1966) 64 Cal.2d 574, 587 [51 Cal.Rptr. 225, 414 P.2d 353].)

In the 40 years since the *Ireland* court announced its sweeping "merger doctrine," this court has struggled mightily with its fallout in an attempt to redefine the contours of the venerable second degree felony-murder rule. The history of our " 'muddled' " (maj. opn., *ante*, at p. 1189) case law on the subject is accurately recounted in painstaking detail in the majority opinion. (*Id.* at pp. 1188–1201.) Two decisions in particular are noteworthy here.

In *People v. Hansen* (1994) 9 Cal.4th 300 [36 Cal.Rptr.2d 609, 885 P.2d 1022] (*Hansen*), we concluded that maliciously and willfully shooting at an inhabited dwelling in violation of section 246, "involves a high probability that death will result and therefore is an inherently dangerous felony . . . for purposes of the second degree felony-murder doctrine." (*Hansen*, at p. 309.) *Hansen* explained that, "application of the second degree felony-murder rule to a homicide resulting from a violation of section 246 directly would serve the fundamental rationale of the felony-murder rule—the deterrence of negligent or accidental killings in the course of the commission of dangerous felonies. The tragic death of innocent and often random victims, both young and old, as the result of the discharge of firearms, has become an alarmingly common occurrence in our society—a phenomenon of enormous concern to the public. By providing notice to persons inclined to willfully discharge a firearm at an inhabited dwelling—even to those individuals who would do so merely to frighten or intimidate the occupants, or to 'leave their calling card'—that such persons will be guilty of murder should their conduct result in the all-too-likely fatal injury of another, the felony-murder rule may serve to deter this type of reprehensible conduct, which has created a climate of fear for significant numbers of Californians even in the privacy of their own homes." (*Hansen*, at pp. 310–311.)

I signed the majority opinion in *Hansen*, and continue to find that decision well reasoned and most directly on point in the matter now before us.[3] I would follow *Hansen* and conclude the jury below was properly instructed on second degree felony murder based on defendant's commission of the inherently dangerous felony of shooting at an occupied vehicle in violation of section 246 and the inference of malice that follows therefrom. The majority,

---

[3] The case before us involves a homicide resulting from defendant shooting at an occupied vehicle in violation of section 246. In *Hansen*, we held that shooting at an "inhabited dwelling house" in violation of that same section (§ 246) is an act inherently dangerous to human life even though the house is not actually occupied at the time of the shooting. (*Hansen, supra*, 9 Cal.4th at pp. 309–311.) We then explained that "[t]he nature of the other acts proscribed by section 246 reinforces the conclusion that the Legislature viewed the offense of discharging a firearm at an *inhabited dwelling* as posing a risk of death comparable to that involved in shooting at an *occupied* building or motor vehicle." (*Id.* at p. 310.) The majority agrees that shooting at an occupied vehicle, as occurred here, is an inherently dangerous felony. (Maj. opn., *ante*, at p. 1188.) So do I.

in contrast, rejects the analysis and holding in *Hansen* and expressly over-rules it. (Maj. opn., *ante*, at pp. 1198–1199.)

In *People v. Robertson* (2004) 34 Cal.4th 156, 166 [17 Cal.Rptr.3d 604, 95 P.3d 872] (*Robertson*), we again considered whether the trial court had properly instructed the jury on second degree felony murder, this time based on the felony of discharging a firearm in a grossly negligent manner. (§ 246.3.) The defendant in *Robertson* claimed he fired his gun "upwards into the air" merely intending to " 'scare people away.' " (*Robertson, supra*, 34 Cal.4th at p. 162.) The *Robertson* majority rejected (although did not overrule) the rationale of *Hansen, supra*, 9 Cal.4th 300, and went on to resurrect and apply the so-called "collateral purpose" rule derived from two earlier decisions: *People v. Mattison* (1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193] (*Mattison*) and *People v. Taylor* (1970) 11 Cal.App.3d 57 [89 Cal.Rptr. 697]. Briefly, *Robertson* concluded that, under the collateral purpose rule, the merger doctrine did not bar a second degree felony-murder instruction based on the violation of section 246.3. (*Robertson*, at p. 160.) The "collateral purpose" rule can be summarized as a test that reaches a compromise on the all-or-nothing approach taken in *Ireland* regarding assaultive-type felonies and their nonavailability as a basis for second degree felony-murder treatment. Under the collateral purpose rule or test, application of the second degree felony-murder rule is proper only where the underlying felony, although assaultive in nature, is nonetheless committed with a " 'collateral and independent felonious design.' " (*Mattison, supra*, 4 Cal.3d at p. 185; see *Taylor, supra*, 11 Cal.App.3d at p. 63.)

I signed the majority opinion in *Robertson* as well, but I have since come to appreciate that the collateral purpose rule on which it relied is unduly deferential to *Ireland*'s flawed merger doctrine. The majority itself points to several serious concerns raised in the wake of *Robertson*'s reliance on the collateral purpose rule in its effort to mitigate the harsh effects of *Ireland*'s all-or-nothing merger doctrine. (Maj. opn., *ante*, at pp. 1199–1200.) Nonetheless, it can fairly be observed that the decision in *Robertson*, right or wrong, did represent a compromise, for under its holding inherently dangerous felonies, though they be of the assaultive type, could still be used as a basis for second degree felony-murder rule treatment as long as a "collateral purpose" for the commission of such a felony could be demonstrated. (*Robertson, supra*, 34 Cal.4th at p. 160.)

The majority, in contrast, rejects the analysis and holding of *Robertson* and expressly overrules it along with our earlier decision in *Hansen*. (Maj. opn., *ante*, at p. 1200.) The majority, to put it bluntly, is unwilling to ameliorate the harsh effects of *Ireland*'s merger doctrine. The majority instead broadly holds that all felonies that are "assaultive in nature" (*ibid.*) henceforth may not

be used as a basis for a second degree felony-murder prosecution. In short, this court's various attempts over the course of several decades to salvage the second degree felony-murder rule in the wake of *Ireland*'s merger doctrine, and to ameliorate the harsh effects of that all-or-nothing rule, have been wiped clean from the slate. The majority has effectively returned the law to where it stood 40 years ago, just after *Ireland* was decided. I cannot join in the majority's wholesale capitulation to such a seriously flawed decision.

In the end, this case presented us with a clear opportunity to finally get this complex and difficult issue right. The majority's recognition and unequivocal pronouncement, in part II.A. of its opinion—that the second degree felony-murder rule is simply a rule for imputing malice under section 188—furnishes the missing piece to this complex and confusing legal jigsaw puzzle. With that clear pronouncement of the second degree felony-murder rule's true nature and function firmly in hand, I would go on to reach the following logical conclusions with regard to the long-standing tension between that rule and *Ireland*'s merger doctrine.

First, when a homicide has occurred during the perpetration of a felony inherently dangerous to human life, a jury's finding that the perpetrator satisfied all the elements necessary for conviction of that offense, without legal justification or defense, *is* a finding that he or she acted with an "abandoned and malignant heart" (i.e., acted with malice) within the meaning of section 188. Put in terms of the modern definition of implied malice, where one commits a felony inherently dangerous to human life without legal justification or defense, then under operation of the second degree felony-murder rule, a homicide resulting therefrom *is* a killing " ' "proximately result[ing] from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Dellinger, supra*, 49 Cal.3d at p. 1218.)

Once it is understood and accepted that the second degree felony-murder rule is simply *a rule for imputing malice* from the circumstances attending the commission of an inherently dangerous felony during which a homicide occurs, no grounds remain to support the sole rationale offered by the *Ireland* court for the merger doctrine—that use of an assaultive-type felony as the basis for a second degree felony-murder instruction "effectively preclude[s] the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault." (*Ireland, supra*, 70 Cal.2d at p. 539.) The majority's holding in part II.A. of its opinion makes clear it understands and accepts that the second degree felony-murder rule is but a means by which juries impute malice under the

Legislature's statutory definition of second degree implied malice murder. The majority's holding in part II.B. of its opinion nonetheless fails to follow through and reach the logical conclusions to be drawn from the first premise, and instead simply rubberstamps the *Ireland* court's misguided belief that the second degree felony-murder rule improperly removes consideration of malice from the jury's purview.

Second, when a jury convicts of second degree murder under the second degree felony-murder rule, it *has* found the statutory element of malice necessary for conviction of murder. (§§ 187, 188.) Hence, there are no constitutional concerns with regard to whether the jury is finding all the elements of the charged murder, or is not finding all the "facts" that can increase punishment where the defendant is convicted of second degree murder in addition to being convicted of the underlying inherently dangerous felony. (See *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348].)

Third, our recognition today that the second degree felony-murder rule is simply a rule under which the jury may impute malice from the defendant's commission of inherently dangerous criminal acts, thereby undercutting the very rationale given by the *Ireland* court for the merger doctrine, should logically *eliminate* any impediment to the use of inherently dangerous felonies—such as the violation of section 246 (maliciously and willfully shooting at an occupied vehicle) at issue in this case—as the basis for an instruction on second degree felony murder.

The majority's holding, in contrast, works just the opposite result. Prior to this court's decision in *Ireland*, this court had already restricted the felonies that could support a second degree felony-murder conviction to those "inherently dangerous to human life." (*People v. Ford* (1964) 60 Cal.2d 772, 795 [36 Cal.Rptr. 620, 388 P.2d 892].) The justification for the imputation of implied malice under these circumstances is that, "when society has declared certain inherently dangerous conduct to be felonious, a defendant should not be allowed to excuse himself by saying he was unaware of the danger to life." (*People v. Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549].) Hence, whatever felonies may remain available for use in connection with the second degree felony-murder rule after today's holding will both have to qualify as inherently dangerous felonies (*Ford*, at p. 795), and not be "assaultive in nature" or contain any elements that have "an assaultive aspect." (Maj. opn., *ante*, at p. 1200.) I fail to see how the second degree felony-murder rule, thus emasculated, will continue to serve its intended purposes of " 'deter[ring] felons from killing negligently or accidentally' " while "deter[ring] commission of the inherently dangerous felony itself." (Maj. opn., *ante*, at p. 1198.)

In sum, the majority has turned the second degree felony-murder rule on its head by excluding *all felonies* that are "assaultive in nature" (maj. opn., *ante*, at p. 1200), including a violation of section 246, in whatever form, from future use as a basis for second degree felony-murder treatment. In reaching its holding, the majority has rejected decades of sound felony-murder jurisprudence in deference to *Ireland*'s merger doctrine, a doctrine grounded on a single false premise, that use of the second degree felony-murder rule improperly insulates juries from the requirement of finding malice and thereby constitutes unfair "bootstrapping." (*Ireland, supra*, 70 Cal.2d at p. 539.)

In concluding that *Ireland*'s merger doctrine trumps the second degree felony-murder rule in this and all future cases involving "assaultive-type" felonies (maj. opn., *ante*, at p. 1178), the majority professes to heed the concerns raised by some members of this court in past decisions that have addressed the tension between the second degree felony-murder rule and the merger doctrine. (*Id.* at pp. 1194–1195.) I do not believe those concerns justify the result reached by the majority in this case.

For example, in *Robertson, supra*, 34 Cal.4th 156, the issue was whether the trial court properly instructed the jury on second degree felony murder based on discharging a firearm in a grossly negligent manner. (§ 246.3.) In that case the defendant claimed he had heard a sound resembling "either a car backfire or the discharge of a firearm," and merely "fired two warning shots" "upwards into the air" in order to " 'scare people away from my domain.' " (*Robertson*, at p. 162.) The physical evidence was otherwise; the defendant had fired at least three shots, two of which hit a car parked across the street "two feet above ground level." (*Ibid.*) The homicide victim, found 50 yards from where the defendant was standing when he fired his weapon, died from a bullet wound to the back of his head. (*Ibid.*) The majority in *Robertson* concluded *Ireland*'s merger doctrine did not bar a second degree felony-murder instruction. (*Robertson*, at p. 160.)

As the majority observes, Justice Werdegar dissented in *Robertson*, arguing that the underlying felony merged with the resulting homicide. She wrote: "The anomalies created when assaultive conduct is used as the predicate for a second degree felony-murder theory [citation] are too stark and potentially too productive of injustice to be written off as 'characteristic of the second degree felony-murder rule in general' ([*Robertson, supra*, 34 Cal.4th] at p. 173). It simply cannot be the law that a defendant who shot the victim with the intent to kill or injure, but can show he or she acted in unreasonable self-defense, may be convicted of only voluntary manslaughter, whereas a defendant who shot only to scare the victim is precluded from raising that partial defense and is strictly liable as a murderer. The independent and

collateral purposes referred to in *Mattison* must be understood as limited to nonassaultive conduct. In circumstances like the present, the merger doctrine should preclude presentation of a second degree felony-murder theory to the jury." (*Robertson, supra,* 34 Cal.4th at p. 185 (dis. opn. of Werdegar, J.).)

I appreciate and share the concerns voiced by Justice Werdegar in her dissent in *Robertson.* At the threshold, I fail to see why a bald claim by the defendant that he fired his gun "upwards into the air" intending merely to " 'scare people away' " (*Robertson, supra,* 34 Cal.4th at p. 162), a claim that was flatly contradicted by all the physical evidence in the case, including the dead victim who was found 50 yards away felled by a single shot to the back of his head, should be found controlling on the matter of what theory or theories of murder were rightfully available to the prosecution in trying the case. (*In re Christian S.* (1994) 7 Cal.4th 768, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574] (*Christian S.*) [trial courts need only instruct on defenses supported by substantial evidence].)

The particular facts of *Robertson* aside, I agree with Justice Werdegar that the defendants are entitled to present all viable defenses supported by substantial evidence, like imperfect self-defense, in a second degree murder prosecution, whether it be tried on a theory of straight implied malice second degree murder or under the second degree felony-murder rule. But as we recognize today, the second degree felony-murder rule is simply a common law rule for imputing malice, a required element of murder under sections 187 and 188. Understood in that way, there is nothing in the rule, or in relevant murder statutes, to prevent a defendant from establishing that, even where the circumstances show he satisfied all the elements of an alleged inherently dangerous felony during which a homicide occurred, his *actual state of mind* nonetheless precludes drawing an inference of malice from those attending circumstances.

Under the modern construction of the statutory definition of implied malice (§ 188), "malice is presumed when ' "the killing proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another *and who acts with conscious disregard for life.*" ' " (*Dellinger, supra,* 49 Cal.3d at p. 1218, italics added; see also *People v. Sedeno, supra,* 10 Cal.3d at p. 719.) Notwithstanding a charge that a homicide occurred during the commission of an underlying inherently dangerous felony, a finding of second degree felony murder could still be negated by substantial evidence establishing unreasonable or imperfect self-defense, thereby reducing the murder to voluntary manslaughter (see *Christian S., supra,* 7 Cal.4th at p. 783), where the defendant, given his conduct and state of mind under the circumstances surrounding the crimes, is shown not to have actually harbored

a " 'conscious disregard for life.' " (*Dellinger*, at p. 1218.) Even a defendant who claims he "shot into the air" to scare away the homicide victim in an unreasonable or mistaken belief he had to do so in order to defend himself might successfully avoid an imputed inference of malice, and conviction under the second degree felony-murder rule, if substantial evidence bears out his claim and establishes he did not act with a conscious disregard for life.

One might reasonably speculate that if the *Ireland* court had had the benefit of our modern jurisprudence on second degree implied malice murder, including decisions like *Christian S., supra,* 7 Cal.4th 768, and *People v. Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1], which only firmly established the defense of unreasonable or imperfect self-defense years after *Ireland* was decided (see *Flannel,* at p. 683), the concerns that led the *Ireland* court to fashion its sweeping merger doctrine could have been alleviated.

In conclusion, I concur in the majority's holding that the second degree felony-murder rule is a rule for imputing malice, and as such, withstands constitutional scrutiny. (Maj. opn., part II.A., *ante,* at pp. 1180–1188.) I respectfully dissent from the analysis and conclusions reached by the majority with regard to *Ireland*'s merger doctrine. (Maj. opn., part II.B., *ante,* at pp. 1188–1201.) I would follow the well-reasoned decision in *Hansen, supra,* 9 Cal.4th 300, and conclude that the jury below was properly instructed on second degree felony murder based on defendant's commission of the inherently dangerous felony of shooting at an occupied vehicle in violation of section 246.

**MORENO, J.,** Concurring and Dissenting.—The second degree felony-murder rule is deeply flawed. The majority attempts once more to patch this judicially created rule and improves the state of the law considerably, but several years ago I expressed my willingness to "reassess[] the rule in an appropriate case." (*People v. Robertson* (2004) 34 Cal.4th 156, 176 [17 Cal.Rptr.3d 604, 95 P.3d 872] (conc. opn. of Moreno, J.); see *People v. Burroughs* (1984) 35 Cal.3d 824, 829, fn. 3 [201 Cal.Rptr. 319, 678 P.2d 894] ["the time may be ripe to reconsider [the] continued vitality" of the second degree felony-murder rule].) This is that case. The time has come to abandon the second degree felony-murder rule.

"The felony-murder rule has been roundly criticized both by commentators and this court. As one commentator put it, '[t]he felony murder rule has an extensive history of thoughtful condemnation.' [Citation.]" (*People v. Robertson, supra,* 34 Cal.4th 156, 174 (conc. opn. of Moreno, J.).) As the majority notes, "[t]he felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the

defendant's mental state." (Maj. opn., *ante*, at p. 1182.) Regardless of this court's view of the wisdom of doing so, it is within the Legislature's prerogative to remove the necessity to prove malice when a death results from the commission of certain felonies, and the Legislature has done so by codifying the first degree felony-murder rule in Penal Code section 189. (*People v. Dillon* (1983) 34 Cal.3d 441, 472 [194 Cal.Rptr. 390, 668 P.2d 697].) Thus, we cannot abrogate the first degree felony-murder rule because it "is a creature of statute. . . . [T]his court does not sit as a super-legislature with the power to judicially abrogate a statute merely because it is unwise or outdated. [Citations.]" (*Id.* at p. 463.) We do, however, possess the authority to abrogate the second degree felony-murder doctrine because " 'the second degree felony-murder rule remains, as it has been since 1872, a judge-made doctrine without any express basis in the Penal Code.' " (*People v. Robertson, supra,* 34 Cal.4th at p. 174 (conc. opn. of Moreno, J.).)

My concerns about the felony-murder rule are neither new nor original. Nearly 45 years ago, this court acknowledged that "[t]he felony-murder rule has been criticized on the grounds that in almost all cases in which it is applied it is unnecessary and that it erodes the relation between criminal liability and moral culpability. [Citations.] Although it is the law in this state [citation], it should not be extended beyond any rational function that it is designed to serve." (*People v. Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130], fn. omitted.) We have described the felony-murder rule as " 'a "highly artificial concept" ' " that this court long has held "in disfavor" (*People v. Burroughs, supra,* 35 Cal.3d 824, 829) "because it relieves the prosecution of the burden of proving one element of murder, malice aforethought" (*People v. Henderson* (1977) 19 Cal.3d 86, 92 [137 Cal.Rptr. 1, 560 P.2d 1180]). "The felony-murder doctrine has been censured not only because it artificially imposes malice as to one crime because of defendant's commission of another but because it anachronistically resurrects from a bygone age a 'barbaric' concept that has been discarded in the place of its origin." (*People v. Phillips* (1966) 64 Cal.2d 574, 583, fn. 6 [51 Cal.Rptr. 225, 414 P.2d 353], overruled on other grounds in *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

The second degree felony-murder doctrine suffers from all the same infirmities as its first degree counterpart, and more. In *People v. Satchell* (1971) 6 Cal.3d 28, 33, footnote 11 [98 Cal.Rptr. 33, 489 P.2d 1361] (overruled on other grounds in *People v. Flood, supra,* 18 Cal.4th 470, 490, fn. 12) we observed that the second degree felony-murder rule is largely unnecessary and, in those unusual cases in which it would mandate a different result, may be unfair: " 'It may be that the rule is unnecessary in almost all cases in which it is applied, that is to say, that conviction in those cases can be predicated on the normal rules as to murder and as to accomplice liability. In the small residuum of cases, there may be a substantial question whether

the rule reaches a rational result or does not at least distract attention from more relevant criteria.' (Fn. omitted.) [Citation.] [¶] 'If the defendant commits the felony in a highly reckless manner, he can be convicted of second degree murder independently of the shortcut of the felony-murder rule. Under California's interpretation of the implied malice provision of the Penal Code [§ 188], proof of conduct evidencing extreme or wanton recklessness establishes the element of malice aforethought required for a second degree murder conviction. [Citation.] . . . The jury would decide whether the evidence, including the defendant's conduct and inferences rising from it, established the requisite malice aforethought; they would not be bound by the conclusive presumption of malice which the felony murder rule compels.' "

The majority acknowledges the criticism heaped on the second degree felony-murder rule and describes this court's halting and sometimes inconsistent attempts to circumscribe the scope of the rule, most notably by creating the *Ireland* merger doctrine (*People v. Ireland* 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580]). The majority's reformulation of the merger doctrine is an improvement, but it does not correct the basic flaw in the felony-murder rule; that it is largely unnecessary and, in those unusual instances in which it would produce a different result, may be unfair. "In most cases involving a felony-murder theory, prosecutors should have little difficulty proving second degree murder with implied malice. '[M]alice is implied "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life" [citation].' [Citation.] Eliminating second degree felony murder from the prosecution's arsenal would not have a detrimental effect on the prosecution's ability to secure second degree murder convictions, but it would go a long way to restoring the proper balance between culpability and punishment." (*People v. Robertson, supra*, 34 Cal.4th 156, 177 (conc. opn. of Moreno, J.).)

The lack of necessity for the second degree felony-murder rule is demonstrated by the majority's conclusion that the error in instructing the jury on second degree felony murder in this case was harmless because no reasonable juror could have found that defendant participated in this shooting without also concluding that he harbored at least implied malice. I agree. This will be the rule, rather than the exception. In most instances, a juror who finds that the defendant killed the victim while committing a felony that is inherently dangerous to human life necessarily also will conclude that the defendant harbored either express or implied malice and thus committed second degree murder without relying upon the second degree felony-murder rule. Only in those rare cases in which it is not clear that the defendant acted in conscious disregard of life will the second degree felony-murder rule make a difference,

but those are precisely the rare cases in which the rule might result in injustice. I would eliminate the second degree felony-murder rule and rely instead upon the wisdom of juries to recognize those situations in which a defendant commits second degree murder by killing the victim during the commission of a felony that is inherently dangerous to life.

Appellant's petition for a rehearing was denied April 29, 2009.