Filed 12/10/14  P. v. Martinez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B253468 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA361997) |
| v. | |
| SANTOS MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Anne H. Egerton, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Santos Martinez (defendant) appeals from his conviction of first degree murder. He contends that the trial court gave numerous erroneous or ambiguous jury instructions, resulting in the possibility that the jury convicted him of first degree murder without finding the requisite mens rea. He also contends that his counsel rendered ineffective assistance to the extent he failed to object or propose clarifying instructions. We conclude that defendant's contentions are without merit and affirm the judgment.

## BACKGROUND

**Procedural history**

Defendant and codefendant Francisco Gutierrez (Gutierrez) were jointly charged with the murder of Angel Mendoza Bautista (Bautista), in violation of section 187, subdivision (a).[1] In addition, the information alleged pursuant to section 186.22, subdivision (b)(1), that the crime was committed for the benefit of, at the direction of, and in association with a criminal street gang, and that a principal personally discharged a firearm causing death within the meaning of section 12022.53, subdivisions (b), (c), (d), (e), and (e)(1). Also, the information alleged that defendant had suffered a prior serious or violent felony for purposes of both section 667, subdivision (a)(1), and which constituted a "strike" under the "Three Strikes" law (§§ 667, subd. (b)-(i), 1170.12, subd. (a)-(d).)

Defendant and Gutierrez were tried together. A jury found them both guilty of murder as charged and found true the gang and firearm allegations.[2] The prosecution declined to proceed on the prior conviction allegations, and on December 18, 2013, the trial court sentenced defendant to life in prison with a minimum parole eligibility period of 25 years for the murder, plus a consecutive term of 25 years to life for the discharge of a firearm by a principal. The court ordered defendant to pay mandatory fines and fees and entered a restitution order jointly and severally with Gutierrez. Defendant was given

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

[2]     Gutierrez is not a party to this appeal.

2

credit for 680 actual days of presentence custody.  Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence:  the shooting and investigation**

On the evening of August 31, 2007, sometime between 10:00 and 11:00 p.m., Abdon Solis and Bautista were waiting outside the Best Buy market on Pico Boulevard while Abdon's father, Jorge Solis, was inside buying beer.[3]  While they were waiting, a Latino man with tattoos on his neck and wearing a black baseball cap approached.  He asked Bautista, "Where you from?"  When Bautista replied, "Drifters," the man threw a punch at him.  Bautista returned the blow, and the two men fought.  Abdon denied any involvement in gangs or the fight, but testified that Bautista was associated with the Drifters.

When Bautista appeared to get the better of his opponent, another man got out of the driver's side of a nearby dark colored or black vehicle.  The second man wore black clothing and a black ski mask and was holding a shotgun.  Abdon observed that both car doors were open at that time, but he could not tell whether there were other people in the car.  The second man approached Bautista to within about nine feet of him, and then fired the shotgun.  Abdon turned and ran into the store.

Best Buy employee Amelia Muniz testified that she was working at one of the registers near the entrance to the market when she heard two or three gunshots, looked outside, saw a kind of van parked right in front of the store, and heard a young man scream that someone had been killed.  After calling the police, she went outside, where she saw the headless victim and a lot of blood on the ground.  She also saw a black SUV leaving at a high rate of speed.

Later that night, Abdon and Jorge spoke to Officer Tony Rodriguez of the Los Angeles Police Department (LAPD).  Abdon described seeing an SUV approach and stop in the driveway of the market.  He said that the man who fought with Bautista got out of the driver's side, whereas the shooter got out of the passenger side.  Jorge told

---

[3]      To avoid confusion, we refer to Abdon Solis as Abdon and to his father Jorge Solis as Jorge.

Officer Rodriguez that he saw his son run into the market and heard two gunshots; Jorge then ran outside, where he saw a man wearing dark clothing and a ski mask firing a shotgun from the area of a black SUV. The man with the shotgun then got into the SUV, which sped off at a high rate of speed.

Officers investigating the area found a blue Ford Explorer SUV that had crashed into a wall in an alley near the Best Buy market. They found no one inside, but observed that the keys were in the ignition and the air bags had deployed. A more thorough search of the car revealed, among other things, a cell phone in the center console, two black baseball caps on the front passenger floorboard, and a social security card in the name of Pedro Bonilla in the dashboard compartment. Blood was found on the airbags, most of it on the driver's side, as well as on the cracked rearview mirror recovered from a door sill, the driver's door, the backseat, the front passenger floorboard, the exterior of the left rear passenger door, and the right rear armrest.

LAPD Officer George Diego, an officer on the scene after the shooting, recognized the Ford Explorer from a traffic stop he had conducted earlier that month in the area of 15th Street and either Mariposa or Kenmore Avenues, inside the territory of the Playboys gang. Defendant, a member of that gang, was driving the SUV at the time of the stop. Defendant gave his name as Pedro Bonilla and produced a California driver's license in that name.[4] Officer Diego still had a copy of the ticket he gave defendant and he passed that information on to other officers.

Investigators found two spent Schonebeck shotgun shells near Bautista's body. A part of a shotgun shell (a "wad") and slug fragments were also found near the body. The medical examiner Dr. Juan Carrillo recovered shotgun fragments and a wad from inside Bautista's body when he performed the autopsy. Dr. Carrillo testified that Bautista died of multiple shotgun wounds. He was struck three separate times: one in the upper right

---

[4]    The former owner of the Explorer, Jose Parraga, testified he sold the car to Pedro Bonilla in May 2007. The buyer was to make monthly payments. The last payment was made August 15, 2007, not long before Parraga was notified that the car had been towed to a storage yard.

back; one in the left lower back; and a third in the head.  The shooter was within three or four feet when he inflicted one of the back wounds, and very close when he inflicted the head wound.  The shotgun barrel touched or nearly touched the victim's head when the shotgun was fired.  Each of the back wounds would have been fatal, and it was apparent to Dr. Carrillo that the head wound was the last to be inflicted.  Dr. Carrillo inferred from the direction of the scattering of the victim's brain matter that his head was supported by the ground; thus Bautista was already incapacitated by the back wounds and lying on the ground.

One month after the shooting, a shotgun was found by residents in their little used garage on Magnolia Avenue, about a quarter mile from the Best Buy Market.  They called the police, and LAPD Officer Anne Michelle Green and her partner collected the gun.  When Officer Green examined the shotgun, she found a spent 12-gauge Schonebeck shell inside.  She testified that in her experience most shootings were done with handguns; shotgun shootings were rare.  The shotgun was later inadvertently destroyed, but not before it was swabbed for DNA.

DNA was extracted from the headbands of the two baseball caps and the blood found in the SUV, as well as from the recovered shotgun.  Defendant's DNA matched that found on one of the caps, and Gutierrez's DNA matched that found on the other cap.  DNA extracted from the blood found on the airbags, the rear window sill, and broken rearview mirror (item Nos. 26-31) matched defendant's DNA.  The DNA extracted from blood in the backseat (item Nos. 32-35) matched Gutierrez's DNA.  The DNA extracted from each blood item was from a single source, whereas the DNA on the caps and the shotgun came from more than one contributor.  The analysis of the DNA extracted from the caps showed that Gutierrez and defendant were the major contributors to the respective caps.  The analysis of the shotgun resulted in a partial profile that matched part of Gutierrez's profile, and just one in one million would do so.

Defendant proved difficult to locate and was finally taken into custody on April 30, 2009.  He was charged with an unrelated crime and interviewed by Detective Gilbert Alonso, the investigating officer in this case.  Defendant told Detective Alonso that he

5

had been aware that the police were looking for him since the day after his car had been stolen. Defendant claimed he was near Pico Boulevard and Fedora Street when members of a different gang pulled up in a white van, got out armed with bats, beat him, and took his car. Defendant admitted that he never reported the car theft or the beating.

Detective Alonso placed defendant in a jail cell equipped with a recording device. Excerpts of recorded conversations were played for the jury. Defendant told a cellmate that he knew he was "fighting a murder case" and that the police had obtained his DNA and his car when he crashed it and bled. He explained: "That same day that I did . . . that I pulled the job, fool, the cops were following me. So I crashed my car, fool, but I was able to get the fuck outta there, but I left blood in the car and they just caught me." Asked where he was from, defendant replied that he was with the Playboys on Pico Boulevard and Vermont Avenue. Defendant said that the police did not have the gun, and added: "That's why I told the detectives, 'No way! They fucked me over. Some guys took my car and I don't know what the fuck they went and did.' And they don't believe me, fool. And he says, 'What . . . do you mean they stole it from you if you -- we found blood in your car?' So I said, 'Well I don't know. Cuz these guys, they . . . they beat me up -- I said -- Maybe there was some blood left there in my car,' I said. The . . . detectives don't believe me, fool."

**Gang evidence**

LAPD Officer Nicholas Gallego testified that while working in a gang assignment, he investigated the Playboys gang and served members with gang injunctions that prohibited them from breaking any law and limited their association with other members of a criminal street gang. Officer Gallego had met Gutierrez once before, knew him to be a member of the Playboys gang, and had served him with an injunction.

The location where Officer Diego stopped the Ford Explorer and issued defendant a traffic citation on August 4, 2007, was in the heart of the Playboys gang territory. Officer Diego testified that he was able to identify defendant as a gang member during that stop, either because defendant admitted membership in the Playboys gang or because of his tattoos.

6

In 2007, LAPD Officer Allan Corrales was assigned to a gang investigation team which focused on the Playboys street gang. On September 22, 2007, he and Officer Michael Boyle responded to a gang disturbance call at 11th Street and Kenmore Avenue where he saw Gutierrez with another gang member, Manuel Garcia, throwing alcoholic beverage containers in public. Officer Boyle was aware that Gutierrez had been served with the gang injunction, and had prior contacts with Gutierrez during which Gutierrez had admitted to being a member of the Playboys gang, with the moniker, "Blanco." One such prior contact was in front of Gutierrez's home on Fedora Avenue, where Officer Boyle saw Gutierrez's tattoos: three dots under his right eye; a Playboy bunny on his right hand; and the name of the gang on his stomach. Officer Boyle knew Gutierrez to be a member of the CLS or Chicos Locos clique, which was a subgroup of the Playboys gang.

Detective Alonso took photographs of the cell phone found in defendant's SUV after the shooting. He showed the jury the writings and images on the phone: "Los Angeles" with a backward N and the number 5150; a Playboy bunny smoking a stogie or cigarette; the letters D, K, and S, signifying "Dukes," with "L.A." inside the D; the Los Angeles area code, 213; a rabbit; "Fedo" (short for Fedora); "Bam, bam"; "Fuck the rest"; and "187, police." Detective Alonso explained that "Pico y Fedora" was the name of a clique of the Westside Playboys, and that 187 referred to Penal Code section 187, which defines murder.

LAPD Officer Shane Bua testified as the prosecution's gang expert. He was regularly assigned to monitor gangs, and had training and experience in the culture of Hispanic gangs, especially the Playboys. Officer Bua described the Playboys territory, which changed occasionally, but remained centered near Pico Boulevard, Fedora Street, and Normandie Avenue. He explained why territory was so important to gangs: making other gangs afraid to enter its territory elevated the gang's status and prevented narcotics sales by anyone unaffiliated with the gang. Tagging and graffiti were intended to remind rival gangs of the boundaries, rather like gang street signs. The Drifters gang was one of the main rivals of Playboys. On August 31, 2007, there were over 600 documented

7

members of the Playboys gang and its cliques, and at least 200 of them were then active or semi-active. Violence was an everyday part of gang life. It was used to intimidate enemies and the community, in order to discourage the reporting of crimes or other gang activity. Committing violent acts made them look strong, and encouraged other gangs to become their allies.

In Officer Bua's opinion, the Playboys gang was an active criminal street gang whose primary activities were narcotics sales, robberies, assaulting rivals, witnesses, and others, extortion, tagging, assaults with a deadly weapon, murder, and coming together to intimidate the community. Weapons commonly used were knives, bats, handguns, shotguns, rifles, and vehicles. Officer Bua produced the certified conviction records of two Playboys gang members: Juan Carlos Delgado (Juan), who committed an assault with a deadly weapon in 2005, and Sergio Delgado (Sergio), who was a felon in possession of a firearm in 2005. Officer Bua was acquainted with both men and knew them to be Playboys gang members. The assault with a deadly weapon occurred in an area claimed by the Playboys, when several Playboys gang members encountered a person who was not a gang member, and Juan "hit him up" by asking, "Where are you from?" Officer Bua explained that asking someone to name his neighborhood or gang affiliation was the ultimate gang challenge, and in that case, when the person replied that he was not a gang member, Juan and his fellow Playboys gang members robbed him at gunpoint and physically assaulted him. Sergio was considered one of the most active, hardcore Playboys gang members at the time of his crime. He had multiple gang related tattoos, which only active gang members were allowed to have, as they signified that work had been performed for the gang.

The Playboys gang's common signs and symbols included a hand sign consisting of bunny ears formed the with the ring and middle fingers. Officer Bua identified a photograph of defendant with visible tattoos displaying a Playboys hand sign. He explained that facial tattoos indicated a very high level of dedication to the gang, as they were meant to intimidate people and expose the member to the gang's enemies. Officer Bua was acquainted with defendant prior to the shooting. He was also familiar with

8

defendant's tattoos, as photographs of them were posted on the station bulletin board during 2008. Defendant's tattoos included a face wearing a Fedora on the back of his head with two guns and the words "Fuck L.A.P.D.," Playboy bunny symbol on his arm, and the letters P, B, and S, meaning Playboys, between the bunny ears. In Officer Bua's opinion, on August 31, 2007, defendant was an active member of the Playboys gang and he belonged to the Dukes clique.

Officer Bua was also well acquainted with Gutierrez. In Officer Bua's opinion, Gutierrez was also an active Playboys gang member at the time of the shooting, and a member of the Chicos Locos clique. Officer Bua explained that members of different Playboys cliques were known to associate with one another and to commit crimes together. In 2008, Gutierrez told Officer Bua that he had been a Playboys gang member for about four years, and other gang officers reported contact with Gutierrez since 2004. Officer Bua identified photographs of Gutierrez's gang related tattoos: Playboys related tattoos on his abdomen and hand, and three dots next to one of his eyes, which was a gang expression meaning "my crazy life."

The hub of Drifters territory was the neighborhood surrounding Pico Boulevard and Magnolia Street. This neighborhood shared some middle and high schools with Playboys territory. At the time of the shooting the Playboys gang and the Drifters were involved in an ongoing struggle for control of the schools, resulting in fights designed to make students want to join the stronger gang and afraid to join the weaker gang. In August 2007, the Playboys gang was dominating the Drifters. Playboys territory was vast compared to the Drifters's territory, and Drifters were victims about five times more often than Playboys.

Officer Bua explained that the term "going on a mission" and "putting in work" meant going out in association with fellow gang members to do something to benefit the gang, such as going into rival territory to commit crimes, tag, or physically assault the enemy. Each gang member would be assigned a role to play on the mission, such as the getaway driver, the tagger, the robber, or the keeper of the firearm with the responsibility to protect others on the mission. Anyone on the mission who failed to "step up" and

9

fulfill his role could suffer great consequences within the gang. Gang members on missions in rival gang territory went in groups for the backup and camaraderie, and because it was more intimidating to their victims.

As a general rule, gang members took weapons with them on missions, and it would be unlikely for anyone in the car not to know when someone was armed. Officer Bua explained that many gang members had told him at various times that it was a matter of respect to inform a fellow gang member about the presence in the car of a concealed firearm, a large amount of narcotics, or other item that could get one in trouble with the police if stopped. It would then be up to the individual to decide whether he wanted to be there.

Officer Bua also explained the very important concept of respect in gang culture. Gang members equated fear with respect, and thus earned respect by committing crimes and by dominating and victimizing rival gangs. Individual gang members earned the respect of their gang by committing crimes, and the more hardcore the crimes, the greater the respect for the gang and the individual member within the gang. A rival gang member would be considered completely disrespectful if he came into the gang's territory without just passing through. Starting a fistfight with a rival in the rival's territory would also be a sign of disrespect, and losing the fight would cause the loser's gang to appear weak, which would result in a loss of respect. Being disrespected or losing respect would present a challenge to the gang member and could result in physical or verbal retaliation; he would want to gain back the gang's respect by any means necessary.

Officer Bua gave his opinion that the following hypothetical facts would describe an activity that would benefit a gang: "[T]wo or more gang members from Playboys went into territory for Drifters and one of the occupants of that car had a shotgun and a ski mask going into that rival territory, one of the occupants of the car got out and said to a young man on the sidewalk, 'Where are you from?' the young man responds, 'Drifters,' and a fistfight follows in which the Drifters gang member is winning the fistfight and another occupant of the car gets out with a shotgun and shoots and kills the Drifters gang member." He explained that going on a mission to challenge a rival in his territory,

10

particularly armed with a very visible weapon such as a shotgun, and then killing the rival to prevent him from winning the fight, would demonstrate to the rival gang and the community that the Playboys gang was incredibly bold and to be feared. This enhanced reputation would benefit the gang by enabling its members to get away with committing more crimes. The shooter would also elevate his status within the gang by showing his willingness to commit murder to protect his fellow gang member.

Officer Bua testified that violence would be the expected result of going on a mission in rival gang territory. Gang members expect rivals to defend their territory from those who enter it to commit crimes, and calling out a rival gang member in the rival's territory could easily lead to an escalation in violence.

The defense called no witnesses.

## DISCUSSION

### I. Murder as natural and probable consequence

In a supplemental opening brief submitted after the recent decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), defendant contends that the trial court erroneously instructed the jury that it could find defendant guilty of first degree murder as an aider and abettor, based upon the natural and probable consequences doctrine.

#### A. *Applicable legal principles*

"All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) "[A] person [directly] aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) "[U]nder the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a

11

murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault. [Citation.]" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).)

In *Chiu*, our Supreme Court held "that an aider and abettor may not be convicted of *first degree* premeditated murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles. [Citation.]" (*Chiu, supra*, 59 Cal.4th at pp. 158-159, italics added.) The court did not disapprove use of the doctrine as it relates to *second degree* murder. It explained: "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors -- to deter them from aiding or encouraging the commission of offenses -- is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder. [Citation.] It is also consistent with reasonable concepts of culpability." (*Id*. at p. 165.)

### B.  Instructions given

We have reviewed the instructions given by the trial court and find them deficient. Here, the jury was instructed that it could find defendant guilty of murder under two alternate theories of aiding and abetting liability. First, it was instructed with CALCRIM No. 401 that defendant was guilty if he directly aided and abetted the shooter in the death of Bautista. Second, the jury was instructed with CALCRIM No. 403 that defendant could be found guilty of murder based on aiding and abetting a target crime that had murder as a natural and probable consequence. The jury was also instructed that in order to find defendant guilty of first degree murder, it had to find that he acted willfully, deliberately, and with premeditation. The jury did not submit any note or request indicating that it was concerned about the different mental states of the shooter or aider and abettor.

The instructions given were deficient in that they failed to specifically inform the jury that it could not find defendant guilty of first degree premeditated murder under the natural and probable consequences doctrine. The absence of that instruction means that if the jury used the natural and probable consequences theory to return the first degree murder conviction, it was in error. (*Chiu, supra*, 59 Cal.4th at pp. 158-199, 166.)

### C. Evidence and argument

Defendant contends that the prosecutor caused confusion by arguing that the jury could convict him of murder under the natural and probable consequences doctrine. In fact, both the prosecutor's arguments and the evidence support a finding, beyond a reasonable doubt, that the jury based its first degree murder verdict on one of two valid theories of liability: that defendant directly aided and abetted the crime of premeditated first degree murder, or that defendant was guilty of first degree murder under a theory of conspiracy.

The prosecutor did not argue that the natural and probable consequences doctrine applied to premeditated first degree murder. Instead she argued there were three theories of liability available to convict the driver, whom she argued was defendant, of murder: conspiracy; aiding and abetting murder; or aiding and abetting an assault or battery, which had murder as a natural and probable consequence. She argued that direct aiding and abetting was the primary theory. That the shooter intended to kill Bautista, that defendant was one of the other gang members with the shooter, and that he shared the shooter's intent to kill. The prosecutor clearly explained that if the jury determined that the codefendants committed murder, it should go on to determine whether they "intended to kill Angel Bautista." The prosecutor argued that to find that the shooter and "the other people" with him committed first degree murder, the jury would have to find not only that they shared that intent but also that the murder was willful, deliberate, and premeditated.

Here the evidence demonstrated that defendant, an admitted Playboys gang member, drove his vehicle into rival gang territory, accompanied by Gutierrez and another Playboys gang member, where they stopped the car, got out and immediately

13

issued a gang challenge to Bautista. Defendant then engaged in a fistfight with Bautista. When Bautista bested defendant, Gutierrez shot Bautista with a shotgun in fulfillment of the purpose of the encounter: to do violence to a rival gang member.

The prosecutor then argued the natural and probable consequences theory of aiding and abetting liability, stating, "But in this case, there's some evidence to show, 'Hey, what we're going to do is we're going to see what we can get. We're going to inflict some violence here. We're going to go on a mission, we're going to do our thing, beat down a Drifters gang member.'"

After final arguments, the jury sent out notes requesting the definition of second degree murder and intent to kill. The court read additional language from revised versions of CALCRIM Nos. 520 and 521, explained that any murder that is not murder in the first degree as defined in CALCRIM No. 521 is murder in the second degree, and instructed that intent to kill should be understood in the ordinary, everyday meaning of the words. The court sent in written copies of the revised versions of the full instructions.

Thus counsel's arguments and the instructions made clear that the jury could not find defendant guilty of first degree murder unless he harbored the required mental state. "It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) We conclude that there is a basis in the record to find that the verdict was based on a valid ground.

As stated in *Chiu*, the relevant test of prejudice is:

> "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that the defendant directly aided and abetted the premeditated murder. [Citation.]"

(*Chiu, supra*, 59 Cal.4th at p. 167, citing *People v. Chun* (2009) 45 Cal.4th 1172, 1201, 1203-1205 (*Chun*).)

14

In *Chun*, the court explained that the test for prejudice in the context of instructional error that presents an invalid theory to the jury is as follows: "'The error in the present case can be harmless only if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict *did* find without finding this point as well.' [Citation.]" (*Chun, supra*, 45 Cal.4th at p. 1204, citing *California v. Roy* (1996) 519 U.S. 2, 7.) However, the court expressly noted that it was not holding that this test was the only way of demonstrating harmless error. (*Chun, supra*, at pp. 1204-1205.)

In this case, the prosecutor's arguments and the evidence leaves no reasonable doubt that the jury based its first degree murder verdict on one of two valid legal theories: that defendant directly aided and abetted the crime of first degree murder, or that defendant was guilty of first degree murder under a conspiracy theory.

## II. Involuntary manslaughter

Defendant contends that the trial court erred by failing to instruct the jury sua sponte regarding involuntary manslaughter as a lesser included offense of murder. Defendant contends that his defense at trial was that he was not the shooter and did not share the shooter's intent to kill, but intended only to commit an assault and that murder was not reasonably foreseeable and thus not a natural and probable consequence of his assault.

Involuntary manslaughter is an unlawful killing "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192.) "Generally, involuntary manslaughter is a lesser offense included within the offense of murder. [Citation.] Due process requires that the jury be instructed on a lesser included offense *only* when the evidence warrants such an instruction. [Citations.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.)

Defendant cites the principle that where a lesser offense, *but not the greater*, is a reasonably foreseeable consequence of the crime originally aided and abetted, the trial court must instruct the jury that it may find a defendant guilty of the lesser offense, even if it determined the perpetrator was guilty of the greater. (*People v. Woods* (1992) 8

15

Cal.App.4th 1570, 1585-1588.) Defendant argues that the evidence was such that a reasonable jury could conclude that he committed no more than a misdemeanor assault, and that the natural and probable consequence of such an assault was involuntary manslaughter.

A natural and probable consequence is one that was reasonably foreseeable under *all* the circumstances. (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).) Reasonable foreseeability is determined under an objective standard. (*Chiu, supra*, 59 Cal.4th at p. 161.) When the evidence demonstrates that a defendant committed a deliberate criminal act, not simply a criminally negligent act, and under all the circumstances murder was reasonably foreseeable, the trial court has no sua sponte obligation to give an involuntary manslaughter instruction. (*People v. Huynh* (2002) 99 Cal.App.4th 662, 679.)

A shooting death is often a reasonably foreseeable consequence of a gang confrontation. (See *Medina, supra*, 46 Cal.4th at pp. 925-926.)[5] Here, substantial evidence showed that defendant went with at least one other gang member on a "mission" in rival gang territory.[6] The Playboys's mission in this case was apparently to assault a rival gang member as the driver pulled up near Bautista and defendant or other occupant of the car immediately began the assault. In gang culture, violence is a reasonably expected outcome of such a mission, and defendant's gang was an active criminal street gang whose primary activities included assaults with a deadly weapon and murder.

---

[5] We decline defendant's invitation to adopt the *Medina* dissent's criticism of this observation by the majority. (See *Medina, supra*, 46 Cal.4th at pp. 932-933 (dis. opn. of Moreno, J.).)

[6] We also reject any suggestion that the gang expert's testimony should be discounted because it was "generic" and did not include an opinion regarding defendant's own actions or intent. Officer Bua testified as an expert not only in Hispanic gang culture generally, but also with special expertise and experience in the culture of the Playboys gang. Any opinion regarding defendant's state of mind would not have been admissible, but expert testimony regarding gang culture and the defendant's gang can provide substantial evidence of a gang motive. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1048-1049; *People v. Albillar* (2010) 51 Cal.4th 47, 63.)

16

Defendant and his companions must have expected gun violence, as one of them, wearing black clothing and a black ski mask, was armed with a shotgun.

Defendant contends that there was no convincing evidence that he knew his companion was armed. We disagree. Defendant himself suggested otherwise when he admitted in his recorded jailhouse conversation that he had "pulled the job," crashed his car and left blood, and knew that the police did not have "the gun." Further, if the trier of fact assumed that defendant failed to notice his companion's black clothing and ski mask, it is hard to imagine that such an obvious weapon as a shotgun, was not visible to all of the participants in the mission. Thus, any one of them could have reasonably foreseen a shooting the result of an intentional killing; and indeed, such evidence strongly suggests that all of the gang members in the car were subjectively aware of such an eventuality. We conclude that under such circumstances, a reasonable person would have foreseen an intentional killing as a probable consequence of the mission and the assault on Bautista. As the evidence failed to show that the greater offense (murder) was not reasonably foreseeable, the trial court had no sua sponte duty to instruct the jury regarding involuntary manslaughter as a lesser included offense. (See *People v. Huynh, supra*, 99 Cal.App.4th at p. 679.) Moreover, if the trial court erred, any such error would be harmless beyond a reasonable doubt, as "'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions' [citation]." (*People v. Prettyman* (1996) 14 Cal.4th 248, 276.) As discussed above, we are convinced beyond a reasonable doubt that the jury properly reached their verdict under either a direct aiding and abetting theory or one based on conspiracy. We are thus precluded from finding that manslaughter, instead of murder, was a natural and probable consequence of the initial assault. Therefore, there is no prejudice resulting from the failure to instruct the jury on involuntary manslaughter.

### III. CALCRIM Nos. 400 and 401

Defendant contends that the trial court erred in instructing the jury with regard to direct aiding and abetting with CALCRIM Nos. 400 and 401, because the two instructions failed to state that an accomplice can be found guilty of a lesser crime than

the perpetrator.[7]  Defendant acknowledges that he did not object to the instructions, but contends that we should review the issue as the error affected his substantial rights.  (See *People v. Famalaro* (2011) 52 Cal.4th 1, 35; § 1259.)  We have reviewed the instructions and defendant's arguments, and conclude that the contention lacks merit.

Defendant notes that in *McCoy* our Supreme Court held that in murder cases not based on the natural and probable consequences doctrine, the aider and abettor may be found guilty of a lesser offense if he did not know or share the murderous intent of the actual perpetrator.  (*McCoy, supra*, 25 Cal.4th at p. 1118 & fn. 1.)  Defendant relies on cases in which former CALCRIM No.400 was found to be misleading in some circumstances because it instructed that an aider and abettor was "equally guilty" as the perpetrator, which might lead a jury to conclude that any aider and abettor is necessarily guilty of the same offense as the perpetrator regardless of the aider and abettor's particular state of mind.  (See, e.g., *People v. Nero* (2010) 181 Cal.App.4th 504, 518; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.)

Although the "equally guilty" language caused CALCRIM No. 400 to be misleading and incomplete in some cases, it correctly stated the law.  (*People v. Loza* (2012) 207 Cal.App.4th 332, 349-350; *People v. Lopez* (2011) 198 Cal.App.4th 1106,

---

**7**     The trial court instructed the jury with the revised CALCRIM No. 400 as follows:  "A person may be guilty of a crime in two ways . . . .  One, he may have directly committed the crime.  I will call that person the perpetrator.  Two, he may have aided and abetted a perpetrator who directly committed the crime.  A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator.  Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."  The relevant portion of CALCRIM No. 401 was as follows:  "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:  one, the perpetrator committed the crime; two, the defendant knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.  Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to and does, in fact, aid, facilitate, promote, encourage or instigate the perpetrator' s commission of that crime."

18

1118-1119 & fn. 5; see *People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 433-434 [former CALJIC No. 3.00].)  As the jury in this case was given revised instructions without the "equally guilty" language, the instructions were not misleading.

Nevertheless, defendant contends that the jury was "essentially instructed" that it could find him guilty of first degree murder as an aider and abettor based upon the perpetrator's premeditated intent to kill, rather than defendant's own intent.  He argues that CALCRIM No. 401 created this confusion by referring generally to "the crime" and "the defendant," and by failing to explain the particular crime, degrees, and required mens rea until the court read CALCRIM Nos. 520 and 521.  Defendant also argues that the trial court further erred by instructing:  "Unless I tell you otherwise, all instructions apply to each defendant . . . ."

Defendant's argument is unclear, but he appears to suggest that although the trial court did, in fact, instruct the jury as to the elements of first and second degree murder and the required mens rea for first degree murder, it should have read the instructions in a different order, combined them with the aiding and abetting instructions, added different or less ambiguous language, and perhaps even directed a finding that defendant was not the shooter.  In essence, defendant appears to think the jury was incapable of understanding its instructions or correlating them with other instructions.  On the contrary, as we have previously observed, "[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. [Citation.]"  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  If defendant wished clarification, different language, or additional, pinpoint instructions, they should have been requested in the trial court.  As the instructions given were correct in the law on this issue and responsive to the evidence, the trial court had no duty to give additional clarifying or amplifying instructions absent a request.  (*People v. Mayfield* (1997) 14 Cal.4th 668, 778.)

In any event, we find there was no reasonable likelihood that the jurors were misled by the instructions and that any error would have been harmless under any standard.  (See *Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a

reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [better result not reasonably probable].) Despite defendant's claim that there was minimal evidence that he shared the shooter's premeditated intent to kill, we find such evidence overwhelming.

Planning suggests premeditation and deliberation (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069), and may be reasonably inferred from evidence that the defendants armed themselves before the shooting. (See, e.g., *People v. Caro* (1988) 46 Cal.3d 1035, 1050; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224.) Defendant's knowledge of the presence of the firearm may reasonably be inferred from the fact a shotgun is a large, visible weapon; from defendant's admission that he pulled a job with a gun just before crashing his car; and from the gang expert's testimony that gang members are generally armed for missions in rival territory and inform one another when there is a firearm in the car. Further, defendant accompanied at least one other gang member, Gutierrez, and there was expert testimony that gang members generally understand that the firearm will be used when a fellow gang member is threatened with harm.

Motive also implies premeditation. (*People v. Mendoza, supra*, 52 Cal.4th at p. 1069.) Defendant's facial tattoos showed him to be a dedicated member of the Playboys, an active criminal street gang whose primary activities included murder, assault with a deadly weapon, and assaulting rival gang members. Motive in gang shootings is reasonably inferred from hatred felt for rival gang members. (*People v. Sanchez, supra*, 26 Cal.4th at p. 849; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001-1002.) Defendant showed his contempt for Bautista, a rival gang member, by assisting his fellow gang members in challenging and assaulting him in his own gang's territory.

These circumstances indicate that defendant was on a preplanned gang mission to challenge and shoot a rival gang member, and militate against a finding that defendant merely happened upon Bautista and engaged in only a simple assault. It is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty of first degree murder even if the trial court had read the instructions in a different order or explained in other or additional language that defendant must have shared the shooter's premeditated intent to kill Bautista.

20

## IV. Assistance of counsel

Defendant contends that if this court finds that his trial counsel failed to preserve any of the instructional errors for review, such failure has resulted in the denial of his right to effective assistance of counsel granted under the United States and California Constitutions. After reviewing defendant's claims of instructional error on the merits, we found that defendant has not been prejudiced by any language or absence of language in the challenged instructions. We thus reject defendant's claim of ineffective assistance of counsel. (See *Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126 (*Rodrigues*).)

## V. CALCRIM No. 416: uncharged conspiracy instruction

Defendant takes the position that the trial court erred in giving an uncharged conspiracy instruction because conspiracy was not supported by substantial evidence.[8]

Evidence of an uncharged conspiracy is admissible as an alternate theory of accomplice liability. (*People v. Valdez* (2012) 55 Cal.4th 82, 149-150, 153-154.) A conspiracy is an express or tacit agreement between two or more persons to commit any crime, followed by an overt act committed by at least one of them for the purpose of furthering the object of the agreement. (*People v. Morante* (1999) 20 Cal.4th 403, 416.) To be entitled to conspiracy instructions, the prosecution need only make a prima face showing of the existence of the conspiracy, which may be done with any competent evidence including circumstantial evidence. (*Rodrigues, supra*, 8 Cal.4th at p. 1134.) "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] . . .' [Citation.]" (*Id.* at p. 1135.)

Defendant complains that there was no direct evidence that he knew one of the occupants of his car was armed, and he contends that the only other evidence relied on by the prosecution was generic gang evidence from which the prosecutor invited speculation. Direct evidence was not required. (*Rodrigues, supra*, 8 Cal.4th at p. 1134.)

---

[8] The trial court read CALCRIM Nos. 416 (uncharged conspiracy) and 417 (coconspirator liability).

21

The gang testimony and the evidence of planning and motive which have been previously summarized as demonstrating defendant's premeditated intent to kill was more than adequate for a prima facie showing of the existence of the conspiracy. While gang association alone does not prove a criminal conspiracy, it is one of the circumstances that may be considered along with other evidence. (*People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 20-21.) "'The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' [Citation.]" (*Rodrigues, supra*, 8 Cal.4th at p. 1135; see also *People v. Maciel* (2013) 57 Cal.4th 482, 517-518 [agreement may be inferred from fact that alleged conspirators were alone together just before crime].)

Here, defendant and Gutierrez were in the same criminal street gang whose primary activities included assaults with a deadly weapon, murder, and assaulting rival gang members; defendant and Gutierrez went together in defendant's car to rival gang territory; one of the occupants of the car challenged a rival gang member under circumstances that would lead any gang member to expect violence; one of them was armed, wore black, and carried a ski mask; gang members are generally expected to provide backup for one another; and defendant's tattoos and cell phone contents suggested he was a devoted member of his gang. Thus the conduct, relationships, interests, and activities of the codefendants suggest an agreement to conduct a mission together in enemy territory, find a rival gang member, criminally assault him, and if circumstances warranted it, to shoot him. We conclude from this evidence that the trial court did not err in giving the requested uncharged conspiracy instruction. (*Rodrigues, supra*, 8 Cal.4th at p. 1134.)

## VI. Natural and probable consequences of conspiracy

Defendant contends that the trial court erred in instructing with CALCRIM No. 416, which defines criminal conspiracy, and with No. 417, which explains the coconspirators' liability for the natural and probable consequences of the conspirators' intended crime. He contends that the instructions were tantamount to permitting the jury

22

to convict him under the felony-murder rule without finding the elements of felony murder.

The felony-murder rule does not require a finding of malice or implied malice; a conviction of first degree felony murder requires a finding of one of the predicate offenses under section 189, and a conviction of second degree felony murder requires the commission of a nonassaultive felony which is inherently dangerous to human life. (*People v. Bryant* (2013) 56 Cal.4th 959, 965.) Defendant argues that the instructions were erroneous because simple assault and battery are assaultive and are neither felonies nor inherently dangerous, and thus cannot be the predicate offenses for either first or second degree felony murder.

The problem underlying defendant's argument is that the trial court did not give felony murder instructions, nor were the conspiracy instructions tantamount to felony murder instructions. Further, the trial court did not instruct the jury that it could convict defendant of first or second degree murder without regard to express or implied malice, or that it could convict a coconspirator of first degree murder based upon the natural and probable consequences of assault or battery.

The court's reading of CALCRIM No. 416 included the following excerpt:

> "To decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit murder, please refer to the separate instructions that I . . . have given you on that crime, which I read a few minutes ago. The People must prove that the members of the alleged conspiracy had an agreement, an intent to commit an assault, a battery, or murder. . . . You may not find the defendant guilty under a conspiracy theory unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes and you all agree which crime he conspired to commit. You must also all agree on the degree of the crime."

The court then read CALCRIM No. 417, which explained vicarious liability for the natural and probable consequences of a coconspirator's intended crime. With regard to the murder charge, the court instructed that the People were required to prove that the defendant conspired to commit assault or battery, and "murder was a natural and probable

23

consequence of the common plan or design of the crime that the defendant conspired to commit." The court specifically referred to its previous instructions concerning first and second degree murder, and instructed the jury that it must agree on the crime defendant conspired to commit as well as the degree of the crime.

The court thus correctly instructed that a conspirator may be vicariously liable for any crime that was a natural and probable consequence of the conspiracy. (See *People v. Prieto* (2003) 30 Cal.4th 226, 249-250.) The analysis under this rule is the same as that under the natural and probable consequences doctrine of aiding and abetting. (*People v. Guillen* (2014) 227 Cal.App.4th 934, 998.) "An aider and abettor's liability for murder under the natural and probable consequences doctrine operates independently of the felony-murder rule. [Citation.]" (*Chiu, supra*, 59 Cal.4th at p. 166; *People v. Culuko* (2000) 78 Cal.App.4th 307, 322.) Thus, an aider and abettor may be convicted of second degree murder even where the target offense was not an inherently dangerous felony. (*People v. Culuko, supra*, at p. 322.)[9]

We conclude that the conspiracy instructions given were not tantamount to felony murder instructions and were not incorrect statements of law. And as we have addressed harmless error in greater detail above, we need not do so again here. It suffices to repeat that the factual question was decided against defendant based on substantial evidence and thus no prejudice appears. (See *People v. Prettyman, supra*, 14 Cal.4th at p. 276.)

---

[9]    Of course, "all conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1237.) Similarly, any kind of willful, deliberate, and premeditated killing may be a predicate offense under the felony-murder rule. (§ 189.)

# DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT

25